GIBSON, DUNN & CRUTCHER LLP
KRISTIN A. LINSLEY, SBN 154148
klinsley@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone:    415.393.8395
Facsimile:    415.374.8471

DEBORAH L. STEIN, SBN 224570
dstein@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:    213.229.7164
Facsimile:    213.229.6164

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
FRANK FALZETTA, SBN 125146
ffalzetta@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, California 90071
Telephone:    213.620.1780
Facsimile:    213.620.1398

JEFFREY S. CROWE, SBN 216055
jcrowe@sheppardmullin.com
650 Town Center Drive, 4th Floor
Costa Mesa, California 92626
Telephone:    714.513.5100
Facsimile:    714.513.5130

STINSON LLP
TODD A. NOTEBOOM, *Pro Hac Vice*
todd.noteboom@stinson.com
50 South Sixth Street, Ste. 2600
Minneapolis, MN 55402
Telephone:    612.335.1894
Facsimile:    612.335.1657

JEREMY A. ROOT, *Pro Hac Vice*
jeremy.root@stinson.com
230 W. McCarty Street
Jefferson City, MO 65101
Telephone:    573.556.3609
Facsimile:    573.556.3635

Attorneys for Defendant
STATE FARM LIFE INSURANCE COMPANY

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

ELIZABETH A. BALLY, Individually and On Behalf Of All Others Similarly Situated,

Plaintiffs,

v.

STATE FARM LIFE INSURANCE COMPANY,

Defendant.

CASE NO. 3:18-CV-04954-CRB

**OPPOSITION OF DEFENDANT STATE FARM LIFE INSURANCE COMPANY TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1

**TABLE OF CONTENTS**

2

Page

3

I. INTRODUCTION ........................................................................................................... 1

4

II. BACKGROUND ........................................................................................................... 5

5

    A.    Universal Life Insurance Policies .......................................................................... 5

6

    B.    The Process for Assigning a Cost of Insurance Rate to Each Insured is Distinct
          From State Farm's Process for Establishing its Cost of Insurance Rate

7

          Structure and Tables ............................................................................................... 6

8

          1.    State Farm's Process For Assigning an Insured's Cost of Insurance
              Rate From Its Pre-Established Rate Tables ............................................ 7

9

          2.    State Farm's Process for Establishing its Underlying Cost of Insurance

10

              Rate Structure and Rate Tables Applicable to All Insureds Under the
              Policy ................................................................................................... 10

11

          3.    The Role of "Mortality" in Reading the Policy .................................... 12

12

          4.    The Role of Annual Notices ................................................................. 14

13

III. LEGAL STANDARD ................................................................................................ 15

14

IV. ARGUMENT ............................................................................................................. 17

15

    A.    Plaintiff Is Not Entitled to Summary Judgment on Her Breach of Contract

16

          Claim ................................................................................................................... 17

17

          1.    California Law Requires Consideration of Both the Text and Any
              Relevant Extrinsic Evidence In Interpreting a Contract, Including an

18

              Insurance Policy .................................................................................. 18

19

          2.    The Plain Policy Text and Overwhelming Extrinsic Evidence Support
              State Farm's Reading of the Policy ..................................................... 20

20

          3.    Plaintiff's Contrary Reading Finds No Support in the Policy Text and

21

              Would Contravene Settled Industry, Actuarial, and Regulatory
              Standards ............................................................................................. 23

22

          4.    Even If The Cost of Insurance Provision Could be Read to Refer to

23

              State Farm's Process of Developing its Underlying Rate Tables, It
              Cannot Reasonably Be Read to Limit Permissible Factors to Age, Sex,

24

              and Rate Class ..................................................................................... 26

25

          5.    This Court Did Not Decide the Contract Issues "As a Matter of Law" in
              Favor of the Class on State Farm's Summary Judgment Motion .................. 29

26

    B.    The Class Is Not Entitled to Summary Judgment on the Conversion Claim ............. 30

27

    C.    Plaintiff Has Not Met Her Summary Judgment Burden on the Statute of

28

          Limitations ........................................................................................................... 31

Gibson, Dunn &
Crutcher LLP

i

D.  Plaintiff Cannot Use Offensive, Non-Mutual Collateral Estoppel to Bar State Farm From Presenting Evidence On Critical Factual Points .................................. 34

1.  The damages determinations in *Vogt* are *not* identical to issues presented here .............................................................................. 36

2.  *Parklane*'s fairness factors foreclose application of the doctrine here .......... 38

E.  Summary Judgment Cannot be Granted on the Declaratory Judgment Claim .......... 39

F.  Summary Judgment is Inappropriate on State Farm's Setoff Defense ...................... 40

V. CONCLUSION .................................................................................................................. 40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc.*,
   852 F.2d 493 (9th Cir. 1988).................................................................................................19

*AIU Ins. Co. v. Superior Court*,
   51 Cal. 3d 807 (1990) ...........................................................................................2, 16, 19, 21

*American Int'l Group, Inc. v. Superior Court*,
   234 Cal. App. 3d 749, 764 (1991)........................................................................................10

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .............................................................................................................15

*April Ent., Inc. v. KTTV*,
   147 Cal. App. 3d 805 (1983)................................................................................................32

*Baker v. Beech Aircraft Corp.*,
   39 Cal. App. 3d 315 (1974)..................................................................................................34

*Baker v. Italian Maple Hold., LLC*,
   13 Cal. App. 5th 1152 (2017)..............................................................................................34

*Bank of the West. v. Superior Court*,
   2 Cal. 4th 1254 (1992) .........................................................................................................18

*Barnes v. The Hershey Co.*,
   2016 WL 192310 (N.D. Cal. Jan. 25, 2019) .........................................................................6

*Boomer v. AT&T Corp.*,
   309 F.3d 404 (7th Cir. 2002)................................................................................................38

*Bruce Foods Corp. v. Tex. Gas Serv.*,
   2014 WL 652312 (W.D. Tex. Feb. 19, 2014) .....................................................................20

*Brighton Trs. v. Transamerica Life Ins. Co.*,
   2019 WL 5784925 (C.D. Cal. Nov. 4, 2019) ......................................................................30

*In re Caranchini*,
   956 S.W.2d 910 (Mo. 1997).................................................................................................36

*Carr v. Holt*,
   134 S.W.3d 647 (Mo. Ct. App. 2004)..................................................................................36

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).............................................................................................................15

Gibson, Dunn &
Crutcher LLP

*City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*,
    43 Cal. 4th 375 (2008) ............................................................................................18

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ...................................................................................................37

*Continental Cas. Co. v. Tierney*,
    1991 WL 207398 (W.D. Mo. July 2, 1991) .....................................................36, 37

*Coop. Home Care, Inc. v. City of St. Louis*,
    514 S.W.3d 571 (Mo. 2017).....................................................................................35

*Custom LED, LLC v. eBay, Inc.*,
    2012 WL 1909333 (N.D. Cal. May 24, 2012) ........................................................40

*Dean v. United of Omaha Life Ins. Co.*,
    2007 WL 7079558 (C.D. Cal. Aug. 27, 2007) .......................................................29

*Duran v. U.S. Bank Nat'l Ass'n*,
    59 Cal. 4th 1 (2014) ................................................................................................33

*Erlich v. Menezes*,
    21 Cal. 4th 543 (1999) ............................................................................................31

*Eucasia Sch. Worldwide, Inc., v. DW Aug Co.*,
    2018 Cal. App. 4th 176 (2013).................................................................................18

*Exec. Bd. of Mo. Baptist Convention. v. Windermere Baptist Conference Ctr.*,
    280 S.W.3d 678 (Mo. Ct. App. 2009) .....................................................................28

*Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*,
    249 F.3d 1132 (9th Cir. 2001).................................................................................15

*Feltner v. Columbia Pictures Tel., Inc.*,
    523 U.S. 340 (1998) ................................................................................................39

*Fireguard Sprinkler Sys., Inc. v. Scottsdale Ins. Co.*,
    864 F.2d 648 (9th Cir. 1988)...................................................................................19

*Fleisher v. Phoenix Life Ins. Co.*,
    18 F. Supp. 3d 456 (S.D.N.Y. 2014)..................................................................28, 29

*Foad Consulting Grp., Inc. v. Azzalino*,
    270 F.3d 821 (9th Cir. 2001)...................................................................................19

*Fox v. Ethicon Endo-Surgery, Inc.*,
    35 Cal. 4th 797 (2005) ..................................................................................31, 32, 34

*Fred Segal, LLC v. CormackHill, LP*,
    821 F. App'x 783 (9th Cir. 2020) ......................................................................16, 29

Gibson, Dunn &
Crutcher LLP

*Green v. Fred Weber, Inc.*,
    254 S.W.3d 874 (Mo. 2008)............................................................................35

*Grisham v. Philip Morris, Inc.*,
    670 F. Supp. 2d 1014 (C.D. Cal. 2009)........................................................39

*Grow Group, Inc. v. North River Ins. Co.*,
    1992 WL 672265 (N.D. Cal. Aug. 14, 1992)................................................19

*Guild Trust v. Union Pac. Land Res. Corp.*,
    682 F.2d 208 (10th Cir. 1982)......................................................................37

*Hendershot v. Ready to Roll Transp., Inc.*,
    228 Cal. App. 4th 1213 (2014)......................................................................33

*Heppler v. J.M. Peters*,
    73 Cal. App. 4th 1265 (1999)........................................................................20

*Horsemen's Benev. & Prot. Assn. v. Valley Racing Assn.*,
    4 Cal. App. 4th 1538 (1992)..........................................................................29

*Int'l Brotherhood of Teamsters v. NASA Servs.*,
    957 F.3d 1038 (9th Cir. 2020)......................................................................19

*Jack Faucett Assocs., Inc. v. Am. Tel. & Tel. Co.*,
    744 F.2d 118 (D.C. Cir. 1984)......................................................................35

*James v. Paul*,
    49 S.W.3d 678 (Mo. 2001)......................................................................36, 38

*Jeanes v. Allied Life Ins. Co.*,
    168 F. Supp. 2d 958 (S.D. Iowa 2001)..........................................................28

*Kim v. Westmoore Part., Inc.*,
    201 Cal. App. 4th 267 (2011)........................................................................31

*Kolbe v. BAC Home Loans Servicing, LP*,
    738 F.3d 432 (1st Cir. 2013).........................................................................20

*Krajewski v. Am. Honda Fin. Corp.*,
    557 F. Supp. 2d 596 (E.D. Pa. 2008)............................................................39

*Krieger v. Nick Alexander Imports, Inc.*,
    234 Cal. App. 3d 205 (1991).........................................................................31

*Lennar Mare Island, LLC v. Steadfast Ins. Co.*,
    2016 WL 829210 (E.D. Cal. Mar. 3, 2016)..................................................31

*Lincoln Gen. Ins. Co. v. Access Claims Adm'rs, Inc.*,
    2007 WL 2492436 (E.D. Cal. Aug. 30, 2007)..............................................31

DEFENDANT STATE FARM'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:18-CV-04954-CRB

*Lindsey v. Normet*,
    405 U.S. 56 (1972) ................................................................................................33

*Miller v. Glenn Miller Prods, Inc.*,
    454 F.3d 975 (9th Cir. 2006) .........................................................................17, 19

*Minkler v. Safeco Ins. Co. of Am.*,
    49 Cal. 4th 315 (2010) ...............................................................3, 16, 19, 30

*Molock v. Whole Foods, Inc.*,
    952 F.3d 293 (D.C. Cir. 2020) ............................................................................33

*Morgan v. Woessner*,
    997 F.2d 1244 (9th Cir. 1993) .............................................................................39

*Nationwide Agribusiness Ins. v. George Perry & Sons, Inc.*,
    338 F. Supp. 3d 1063 (E.D. Cal. 2018) ..............................................................19

*NBCUniversal Media, LLC v. Super. Ct.*,
    225 Cal. App. 4th 1222 (2014) ...........................................................................32

*Norem v. Lincoln Benefit Life Ins. Co.*,
    737 F.3d 1145 (7th Cir. 2013) .......................................................14, 23, 27, 28, 30

*Oates v. Safeco Ins. Co. of Am.*,
    583 S.W.2d 713 (Mo. 1979) ...............................................................................35

*Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., Inc.*,
    69 Cal. 2d 33 (1968) .......................................................................................2, 18

*Parklane Hosiery Co. v. Shore*,
    439 U.S. 322 (1979) .........................................................................35, 36, 38, 39

*Parsons v. Bristol Dev. Co.*,
    62 Cal. 2d 861 (1965) .........................................................................................18

*Paul Revere Variable Annuity Ins. Co. v. Kirschhofer*,
    226 F.3d 15 (1st Cir. 2000) ................................................................................20

*PCO Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*,
    150 Cal. App. 4th 384 (2007).............................................................................20

*Peralta v. Dillard*,
    744 F.3d 1076 (9th Cir. 2014)........................................................3, 4, 16, 29, 30

*Perez-Encinas v. AmerUs Life Ins. Co.*,
    468 F. Supp. 2d 1127 (N.D. Cal. 2006) .............................................................32

*Phoenix Techs. Ltd. v. VMWare, Inc.*,
    2017 WL 1289863 (N.D. Cal. Jan. 6, 2017) ......................................................16

DEFENDANT STATE FARM'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – CASE
NO. 3:18-CV-04954-CRB

Gibson, Dunn &
Crutcher LLP

*Plumlee v. Pfizer, Inc.*,
    664 F. App'x 651 (9th Cir. 2016) .................................................................................32

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996)......................................................................................17

*Quantification Settlement Agmt. Cases*,
    218 Cal. App. 4th 758 (2011) ......................................................................................18

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995)........................................................................................17

*In re Rhone-Poulenc Rorer, Inc.*,
    51 F.3d 1293 (7th Cir. 1995)........................................................................................38

*Rosenbaum v. Phil. Life Ins. Co.*,
    1994 WL 17118392 (C.D. Cal. Mar. 1, 1994) .............................................................28

*Ross v. U.S. Nat. Ass'n*,
    524 F. Supp. 2d 1014 (N.D. Cal. 2008) .......................................................................31

*Schwarzschild v. Tse*,
    69 F.3d 293 (9th Cir. 1995)..........................................................................................35

*Semtek Int'l Inc. v. Lockheed Martin Corp.*,
    531 U.S. 497 (2001) .....................................................................................................35

*Setter v. A.H. Robins Co., Inc.*,
    748 F.2d 1328 (8th Cir. 1984).......................................................................................39

*Shell Oil Co. v. Winterthur Swiss Ins. Co.*,
    12 Cal. App. 4th 715 (1993).....................................................................................19, 21

*Singh v. Amguard Ins. Co.*,
    2016 WL 7469641 (C.D. Cal. Apr. 1, 2016) ...............................................................31

*Smith v. Bayer Corp.*,
    564 U.S. 299 (2011) .....................................................................................................33

*Sonner v. Schwabe N. Am.*,
    911 F.3d 989 (9th Cir. 2018).........................................................................................17

*Spector v. Super. Ct.*,
    55 Cal. 2d 839 (1961) ...................................................................................................33

*Stop Loss Ins. Brokers, Inc. v. Brown & Toland Med. Grp.*,
    143 Cal. App. 4th 1036 (2006)......................................................................................31

*StreamCast Networks, Inc. v. IBIS LLC*,
    2006 WL 5720345 (C.D. Cal. May 2, 2006) ...............................................................39

Gibson, Dunn &
Crutcher LLP

vii

*Suarez v. Life Ins. Co. of N. Am.*,
  206 Cal. App. 3d 1396 (1988) ................................................................................18

*Tauscher v. Phoenix Bd. of Realtors*,
  931 F.3d 959 (9th Cir. 2019) ..................................................................................15

*Tessera, Inc. v. UTAC (Taiwan) Corp.*,
  2016 WL 8729937 (N.D. Cal. Jan. 15, 2016) ........................................................16

*Thao v. Midland Nat'l Life Ins. Co.*,
  549 F.App'x. 534(7th Cir. 2013) ..............................................................14, 23, 30

*Toma v. Bankers Life & Cas. Co.*,
  2019 WL 4229754 (S.D. Cal. Feb. 25, 2019) ........................................................34

*Traynor v. Lexington Ins. Co.*,
  2009 WL 10675394 (C.D. Cal. June 8, 2009) ........................................................34

*Universal Cable Prod., LLC v. Atlantic Specialty Ins. Co.*,
  929 F.3d 1143 (9th Cir. 2019) ................................................................................20

*Universal Green Sols., LLC v. VII Pac Shores Inv'rs, LLC*,
  2014 WL 1994880 (N.D. Cal. May 15, 2014) ........................................................16

*Vogt v. State Farm Life Ins. Co.*,
  963 F.3d 753 (8th Cir. 2020)..............................................................................29, 34

*Voris v. Lampert*,
  7 Cal. 5th 1141, 1151 (2019) ..................................................................................30

*Vu v. Cal. Commerce Club, Inc.*,
  58 Cal. App. 4th 229 (1997)....................................................................................30

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................................................33

*Watts v. Lester E. Cox Med. Ctrs.*,
  376 S.W.3d 633 (Mo. 2012)....................................................................................36

*Westport Inn Corp. v. N. Cal. Relief*,
  76 F. Supp. 3d 869 (N.D. Cal. 2014) ......................................................................19

*Wolf v. Superior Court*,
  114 Cal. App. 4th 1343 (2004).......................................................................3, 19, 23

*Yue v. Conseco Life Ins. Co.*,
  2011 WL 210943 (C.D. Cal. Jan. 19, 2011) ..........................................................27

**Statutes**

Cal. Civ. Code § 1636 ..................................................................................................18

Cal. Civ. Code § 1649 ........................................................................................................19

Cal. Code Civ. Proc. § 337(1) ...........................................................................................31

Cal. Ins. Code § 10509.955 ...............................................................................................10

**Rules**

Fed. R. Civ. P. 56(a) ..........................................................................................................15

N.D. Cal. Civil L.R. 56-3 ...............................................................................................4, 16

**Treatises**

10A C.A. Wright et al., *Fed. Prac. & Proc.* § 2720 (4th ed. 2020).........................15, 16, 29

Gibson, Dunn &
Crutcher LLP

## I.  INTRODUCTION

In this case asserting claims regarding cost of insurance rates in certain Universal Life insurance products issued in California, Plaintiff's summary judgment motion attempts a series of shortcuts to a classwide ruling against State Farm.  According to Plaintiff, the class wins on liability on all claims because this Court supposedly ruled "as a matter of law" for the class on liability issues when it denied State Farm's previous narrow summary judgment motion—even though that question was not before the Court and the class had not even been certified.  And Plaintiff says that this Court is bound by an expert's erroneous factual assumptions in a prior Missouri-only class action brought under Missouri law ("Vogt").  But these attempted shortcuts do not come close to satisfying Plaintiff's heavy burden under Rule 56(a) to establish she is entitled to judgment as a matter of law—much less on a classwide basis.  At each turn, the motion ignores applicable law, tries to twist and expand this Court's prior rulings and Vogt into something they are not, and fail in the face of overwhelming evidence from multiple relevant sources showing that Plaintiff's reading of the Universal Life Policy at issue (the "Policy") and her other summary judgment theories are simply wrong.

Plaintiff predicates her entire classwide liability case for breach of contract, conversion, and declaratory relief on her erroneous assertion that State Farm breached the Policy "as a matter of law" in determining each Insured's monthly cost of insurance rate.  Mot. 1 & 7.  The Policy states that an Insured's monthly cost of insurance rate for each policy year—that is, the rate used to calculate the amount charged to the policyholder each month to pay for the insurance coverage—"is based on the Insured's age on the policy anniversary, sex, and applicable rate class," and defines "rate class" as "[t]he underwriting class of the person insured."  Dkt. 1, Ex. A at 4, 10 (hereinafter "Ex. A").  And that is exactly how each Insured's rate is determined—and how the policyholder knows how the Insured will be grouped for purposes of the cost of insurance rate.  Specifically, using these three inputs reflecting the Insured's personal characteristics—(1) the Insured's age on each anniversary of the policy date, (2) the Insured's sex, and (3) the Insured's "applicable rate class," or "underwriting class"—State Farm determines and assigns each Insured's rate from its underlying rate tables.  The evidence presented with this opposition demonstrates that this is clearly explained to customers and conforms to relevant industry and regulatory standards. And because the factors State Farm uses to determine each individual Insured's monthly cost of insurance rate are exactly those specified in the Policy, there is no breach of any relevant Policy provision.

1   Plaintiff does not claim that State Farm charged her a cost of insurance rate based on the wrong

2   age, sex, or rate class.  Rather, she offers an alternative and objectively unreasonable reading of the

3   Policy—namely, that the phrase "the Insured's age on the policy anniversary, sex, and applicable rate

4   class" refers not to the attributes used to assign an individual Insured's cost of insurance rate from State

5   Farm's tables but to the process by which State Farm *develops* those rate tables in the first instance,

6   meaning that it must develop its rate tables using age, sex, and rate class as the only inputs.  She then

7   contends—no doubt because these factors do not translate into dollars, much less an entire rate schedule—

8   that the phrase "the Insured's age on the policy anniversary, sex, and applicable rate class" actually means

9   "mortality factors."  From there, she leaps to the further contention that State Farm must base its rate

10  structure on the company's internal "mortality table," which contains a set of life expectancy percentages

11  applied to different groups of insureds.  But this argument would require the Court to rewrite the Policy's

12  plain text and never grapples with the fact that the Policy refers not to a "mortality table" or even "mortality

13  factors" but rather to "*the Insured's age on the policy anniversary, sex, and applicable rate class*."  All of

14  these terms necessarily refer to the *individual* Insured's characteristics—not some mortatlity table that

15  might inform the actuarial ratemaking process at an earlier time, before any Insured even purchases the

16  Policy.  Further, Plaintiff's alternative rate model makes no economic or actuarial sense, would not be

17  permitted by state insurance regulators, and is internally inconsistent because it relies on factors other than

18  age, sex and rate class, and ignores a critical factor that does affect rate class—namely, tobacco use.

19  This conclusion is confirmed by the overwhelming (and undisputed) evidence offered by State

20  Farm.  In construing an insurance policy or other contract under California law, the Court must consider

21  relevant extrinsic evidence bearing on the meaning of the contractual language.  *See generally Pacific Gas

22  & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., Inc.*, 69 Cal. 2d 33, 34 (1968).  This is required both

23  to determine whether there are two or more reasonable readings of the provision at issue (the question of

24  ambiguity), and, if so, how the contract should be interpreted.  *Id.*  At the latter stage, the question for the

25  Court, considering the available and relevant extrinsic evidence, is: What were the promisor's (the

26  insurer's) reasonable expectations as to how the promisee (the Insured) understood the provision?  *AIU

27  Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990).  At both stages, the Court considers evidence

28  bearing on the parties' mutual intent, including relevant testimony from party witnesses and any industry

or regulatory expectations or understanding, and revisits each proffered interpretation to determine whether each is still reasonable after consideration of all the evidence.  *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1357-60 (2004).  Only after these sources are exhausted, and assuming more than one reasonable interpretation remains on the table, are any remaining ambiguities resolved under the *contra preferendum* rule.  *Minkler v. Safeco Ins. Co. of America*, 49 Cal. 4th 315, 321 (2010).

When the text and relevant extrinsic evidence are considered, State Farm's straightforward reading of the operative language is the only reasonable one.[1]  At a minimum, State Farm's reasonable expectation was that its customers understood the reference to "the Insured's age on the policy anniversary, sex, and applicable rate class" clause just as State Farm has applied it for decades, and as industry participants and regulators also understood it—namely, as reflecting the process by which the cost of insurance rate for each individual "Insured" for a given policy year is selected from the company's underlying cost of insurance rate tables.  This understanding is supported by the text, by uncontroverted declarations showing State Farm's reasonable expectations as to how its customers understand the language, and by evidence of industry and regulatory practice reading the provision in precisely the same way.

As State Farm's evidence also shows, the process that its actuaries used to develop the underlying cost of insurance rate structure for the Policy resulted in a set of rate tables, showing rates grouped by age, sex, and rate class.  That process is separate and distinct from the later assignment of a rate to any particular customer, a process that determines the Insured's age, sex, and rate class and then assigns the Insured's rate based on those chacteristics from the rate tables.  And the ratemaking process appropriately takes into account the company's operational expense, reserves, and other necessary expenses.  All insurance companies have done this for decades, and it is subject to significant regulatory oversight, including in California.  There is nothing hidden or improper about this process.  Indeed, this process is expected of regulated entities in the insurance industry, and is necessary for insurer compliance with actuarial and

---

[1]  Because the text and extrinsic evidence show that State Farm's reading of the cost of insurance provision is the only reasonable one, State Farm is prepared to request to seek summary judgment in its favor, subject to the Court's ruling on this motion.  As noted in the text, the Court's ruling on State Farm's motion turned on a relatively narrow issue relating to the meaning of the words "based on," and was entered at a time when no record evidence had been developed.  *See generally Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) (en banc) ("[T]he denial of a summary judgment motion is never law of the case because factual development of the case is still ongoing.").

1    regulatory standards.  By contrast, the alternative model offered by Plaintiff's damages expert not only

2    disregards the operative Policy language, but would not meet required actuarial or regulatory standards.[2]

3        Notably, Plaintiff offers *no evidence* in support of her view of the Policy language, relying solely

4    on this Court's prior ruling denying State Farm's earlier summary judgment motion.  She says that this

5    Court held "as a matter of law," and in favor of the class, that the Policy language refers to State Farm's

6    general process of establishing its cost of insurance rate tables and limits State Farm to considering only

7    "mortality factors" in that process.  Mot. 1 & 7.  But that is not what the Court held, and certainly not on

8    a classwide basis, as the class had not even been certified at that point.  Rather, the Court simply concluded

9    that the words "based on" did not "unambiguously permit insurance companies to consider other, unlisted,

10   factors."  Order at 10.  The evidence State Farm has now submitted shows that State Farm did not consider

11   any factors other than Ms. Bally's age, sex, and rate class in assigning her cost of insurance rate, nor did

12   it do so for any other class member.  Accordingly, Plaintiff cannot show an absence of material facts as to

13   whether State Farm breached this policy provision.  And, in any event, a ruling denying a summary

14   judgment motion by one party does not translate into a ruling "as a matter of law" for the other party.  *See*

15   *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) (en banc) ("the denial of a summary judgment

16   motion is never law of the case because factual development of the case is still ongoing"); *accord* N.D.

17   Cal. Civil L.R. 56-3 (statements in order denying a motion for summary judgment "shall not constitute

18   issues deemed established for purposes of the trial of the case, unless the Court so specifies").  Simply put,

19   the Court did *not* rule against State Farm "as a matter of law" on this issue.

20       Plaintiff's motion suffers from other dispositive defects.  She seeks classwide summary judgment

21   on liability, yet she and other class members have not met their burden to show that all or part of their claims

22   are not barred by the statute of limitations, even though the Complaint shows on its face that the alleged

---

[2]  State Farm plans to bring a *Daubert* challenge to any expert opinion of Mr. Witt on which Plaintiff seeks to rely.  In her moving papers, Plaintiff cites several sources of opinions by Mr. Witt.  First, she extensively relies on his report at the class certification stage in this case.  *See* Mot. 3, 4 & nn. 2-3, 5, 8 & n. 4.  Second, she cites and extensively relies on a report he submitted in *Vogt*, and seeks to bind State Farm through collateral estoppel principles to various erroneous "pricing assumptions" in that report. *See id.* at 1, 2 n. 1, 10-11, 12-17 & n.8.  Finally, Plaintiff's motion alludes to a "forthcoming expert report" by Mr. Witt, *id.* at 2, n. 1, but she did not submit that report with her motion.  She disclosed this third Witt expert report at the end of the expert disclosure period, but has not yet submitted it to the Court.  Once Plaintiff has filed her reply papers and any rebuttal expert report, State Farm plans to take Mr. Witt's deposition and, thereafter, file its *Daubert* motion.

breaches, if any, began over 20 years ago.  Contrary to Plaintiff's suggestion, it is not State Farm's burden to show that each class member was on notice of facts putting them on inquiry notice.  Rather, as shown below, where the time bar appears on the face of the complaint, the burden of showing a *lack* of inquiry notice falls squarely on Plaintiff and each class member, and they have offered nothing to meet that burden. In contrast, State Farm has offered evidence showing that customers can and do gain extensive information about the Policy's costs through their individual interactions with agents when they buy insurance.  Whether each Insured was on notice of an alleged breach is a highly individualized inquiry that cannot be resolved as a matter of law on the current record in Plaintiff's favor, much less in favor of thousands of class members.

Even if the Court could look past these problems with liability to reach damages, summary judgment would is inappropriate on that issue.  Plaintiff incorrectly argues that a general damages verdict in a completely separate matter, *Vogt*, somehow collaterally estops State Farm from challenging a set of erroneous factual assumptions that Plaintiff's expert, Mr. Witt, presented to the *Vogt* jury to support his damages model.  But this effort to import an analysis from a different set of classwide plaintiffs' data in a different case, in a different jurisdiction, using different mathematical formulas, is not a proper use of offensive collateral estoppel, and Plaintiff has cited no case where anything remotely like this was done. Moreover, the so-called "facts" Plaintiff seeks to establish were *not* decided—explicitly, implicitly, or "necessarily"—by the *Vogt* jury through its general damages verdict, and they are demonstrably false.  Mr. Witt assumed that State Farm *did not* differentiate on the basis of an Insured's tobacco use in establishing that person's underwriting class, when the undisputed evidence shows that it did.  He also erroneously assumed that State Farm *did* differentiate on the basis of how long the Insured had held the policy, when the undisputed evidence shows that it did not.  Plaintiff's effort to use the equitable doctrine of offensive collateral estoppel to transform false factual assumptions presented to the jury in a Missouri-only case into a binding factual template for this and other class actions around the country would raise precisely the fairness and gamesmanship issues that have led courts not to apply that rarely utilized doctrine.  In short, Plaintiff's motion is seriously flawed and State Farm requests that the Court deny it.

## II.  BACKGROUND

### A.    Universal Life Insurance Policies

This case involves a type of life insurance policy called a flexible premium adjustable policy, also

referred to as a "Universal Life" or "UL" policy. Specifically, it concerns a policy offered on State Farm's Form 94030 that State Farm offered between 1994 and 2004 (the "Policy"). Hendren ¶ 3. Like conventional term life insurance, the Policy provides for a payment to beneficiaries upon Insured's death. Dahlen ¶ 8. Unlike conventional term life insurance, the Policy also has a value component: the policyholder's premium payments are credited to an account value and accrue interest at a rate that is guaranteed to be no less than 4%. Hendren ¶ 3. In addition to certain other charges, a charge is deducted from the account value each month to cover the "cost of insurance." *Id.* That charge functions like the monthly premiums policyholders pay under other forms of insurance in that, together with other charges, it allows State Farm to pay necessary costs associated with the provision of insurance, including payment of death benefits, reserves for future payments, payment of agent commissions, expenses associated with application processing and medical examinations, investment management, and tax and regulatory compliance. *Id.* ¶ 15; Dahlen ¶ 8; Reynolds at 17-18; Hudson ¶ 40.[3]

**B.      The Process for Assigning a Cost of Insurance Rate to Each Insured is Distinct From State Farm's Process for Establishing its Cost of Insurance Rate Structure and Tables**

Plaintiff's claims turn on the "Monthly Cost of Insurance Rates" provision in the Policy, which, in the first sentence, describes the individual characteristics that State Farm uses to identify each Insured's "cost of insurance" rate from the company's preexisting rate tables. Ex. A at 10. The Policy states that the cost of insurance rate for any Insured for a given "policy year" is "based on the Insured's age on the policy anniversary, sex, and applicable rate class"—meaning that insureds of the same sex, age on a given policy anniversary, and rate class will have the same monthly cost of insurance rate. Ex. A at 10. And as shown in the declarations submitted in support of State Farm's opposition, those are the factors—and indeed the only factors—that State Farm considers for each individual Insured when identifying that person's cost of insurance rate from State Farm's underlying rate tables. *See* Hendren ¶¶ 25–32; Prestegaard ¶¶ 3, 9 ; Dahlen ¶¶ 11–14.

The process for determining an Insured's individual age on each policy anniversary, sex, and applicable rate class—and thus the cost of insurance rate that applies to that Insured—is separate and

---

[3]   As cited in this brief, the expert reports of Mary Jo Hudson, Rebecca Kirk Fair, and Lauren J. Stiroh are testimonial in nature and signed under penalty of perjury. Craig Reynolds has submitted a declaration attesting under penalty of perjury to the contents of his report. *See Barnes v. The Hershey Co.*, 2016 WL 192310, at *5 n.4 (N.D. Cal. Jan. 25, 2019).

Gibson, Dunn &
Crutcher LLP

distinct from the process of developing the company's underlying rate structure and rate tables in the first instance. The rate development process happens at an earlier time when the product is being designed and developed, and is subject to regulatory oversight and actuarial standards, principally to ensure that any pricing offered to customers is sufficient to ensure sufficient funds for the company to operate and to pay benefits in the short term and for decades into the future. Hendren ¶¶ 7–16; Dahlen ¶¶ 4, 13; Prestegaard ¶ 9.

As shown below, the fundamental flaw in Plaintiff's theory of the case and her summary judgment motion is that conflates these distinct processes: (1) the process by which State Farm *developed and established* its underlying cost of insurance rate structure and rate tables for this Policy in the first instance, taking into account its business needs and regulatory requirements, and (2) the process by which each Insured's rate was *assigned* at the time of the customer's purchase from those rate tables. It is the second process to which the Policy self-evidently relates when it references "the Insured's age on the policy anniversary, sex, and applicable rate class." These distinct processes are described in turn below.

### 1. State Farm's Process For Assigning an Insured's Cost of Insurance Rate From Its Pre-Established Rate Tables

The Policy's cost of insurance provision identifies the characteristics specific to each Insured that State Farm would use to identify what that Insured's cost of insurance rate will be. The full paragraph states:

> **Monthly Cost of Insurance Rates.** These rates for each policy year are based on the Insured's age on the policy anniversary, sex, and applicable rate class. A rate will be determined for the Initial Basic Amount and for each increase. The rates shown on page 4 are the maximum monthly cost of insurance rates for the Initial Basic Amount. Maximum monthly cost of insurance rates will be provided for each increase in the Basic Amount. We can charge rates lower than those shown. Such rates can be adjusted for projected changes in mortality but cannot exceed the maximum monthly cost of insurance rates. Such adjustments cannot be made more than once a calendar year.

Ex. A at 10. The language principally at issue in this case is the first sentence: "The monthly cost of insurance rate for each policy year is based on the Insured's age on the policy anniversary, sex, and rate class." As shown below, each word and phrase in this provision maps precisely onto the process by which an individual Insured's rate was identified from State Farm's underlying rate tables, and that understanding is confirmed by the overwhelming factual and expert evidence State Farm has submitted.

Once a State Farm customer decided to purchase the Policy while it was being sold, the selection of the monthly cost of insurance rate for the Insured for each policy year would be based on that person's

age on each one-year anniversary of his or her purchase of the Policy (the Insured's "policy anniversary") as well as that person's sex and "applicable rate class." Dahlen ¶¶ 4, 11–14; Hendren ¶ 25–32. As to the third factor, "applicable rate class," an Insured's "rate class" is defined to mean "[t]he underwriting class of the person insured"—a reference to the underwriting process by which each Insured is evaluated for tobacco use, health history, and other health-related issues that affect that person's life expectancy. Ex. A at 5; *see also* Hendren ¶¶ 31–32; Prestegaard ¶¶ 7–8. And the phrase "*applicable* rate class" makes doubly clear that this language refers to the individual Insured, because there can be no "applicable" rate class or "underwriting class" until the Insured goes through the underwriting process. For example, tobacco use is a major determinant for an Insured's rate class, and defines a significant rate class division among all insureds between "tobacco" and "non-tobacco" use. Hendren ¶¶ 28–32; Prestegaard ¶¶ 3, 8; Lopez ¶ 8; Dahlen ¶ 10. Once these additional underwriting-related inputs are obtained and the Insured's "rate class" is determined, the three listed factors—age on each policy anniversary, sex, and applicable rate class—are the factors that determine what monthly cost of insurance rate will apply to that Insured from the company's underlying rate tables. Hendren ¶¶ 31–32; Prestegaard ¶¶ 5–6, 9.

Notably, the second sentence in the cost of insurance paragraph confirms that the first sentence is referring to the process of assigning a rate to an individual Insured. It states that "[a] rate will be determined for the Initial Basic Amount and for each increase." Ex. A at 10. "Initial Basic Amount" means "[t]he amount of coverage *on the Insured* provided by the Basic Plan *on the policy date*." Ex. A at 4 (emphases added). This language maps neatly onto the underwriting process, through which State Farm determines what rate class will apply to each individual Insured for the "Basic Amount" (also a defined term) and then makes a separate rate class determination for each increase from that amount. Prestegaard ¶ 11. Once again, this language by its plain terms refers to the process of assigning a rate class, and thus a cost of insurance rate, to each individual "Insured." *Id.*

As explained by State Farm's witnesses with years of experience working with customers, the operation of the cost of insurance language is straightforward, was explained to customers during the sales process that typically involved identification of the Insured's likely cost of insurance rate from State Farm's rate tables, and is consistent with the process each customer experienced when purchasing the Policy. Although the agent/customer interactions are highly individualized and depend significantly on the

customer's level of sophistication, that process typically started with a discussion between the customer and his or her insurance agent about how insurance works, what products were available to meet the customer's needs, and how the Insured's cost of insurance rate would be determined.  Dahlen ¶ 6.  The agent would ask the customer questions about that person's age, sex, tobacco status, and other health conditions—information that would inform the customer's likely rate class.  *Id.* ¶ 10; Lopez ¶ 8.  Once the agent identified a likely rate class, the agent would consult State Farm's rate tables to show the customer which rate would apply to the Insured.  These tables, consistent with the at-issue policy language, consist of lists of rates grouped by reference to age over the life of the policy, sex, and standard and substandard rate classes, including tobacco and non-tobacco.  Dahlen ¶¶ 11–13; Hendren ¶¶ 25, 30–34 & Ex. A.  Agents also explained that the cost of insurance charge helps cover business expenses and other costs to State Farm to provide the product and meet its obligations under the Policy.  Dahlen ¶¶ 14, 19; Lopez ¶¶ 11–12.

After the agent and customer reviewed the estimate of insurance costs and other features, the customer completed an application and would then be referred to underwriting for a determination of the Insured's "rate class" or "underwriting class."  Ex. A at 4, 10; Dahlen ¶ 15; Lopez ¶¶ 5-6; Prestegaard ¶ 6.  A State Farm underwriter would review and confirm information obtained from the customer and other sources to determine the Insured's final rate class.  Prestegaard ¶¶ 8–9; Dahlen ¶ 15.  After the Insured's applicable rate class was determined, the cost of insurance rate for that person would be identified from State Farm's rate tables based on his or her age, sex, and rate class.  Dahlen  ¶¶ 4, 20; Prestegaard ¶¶ 8–9.  By assigning the Insured's cost of insurance rate based on the factors listed in the Policy, State Farm complied with the precise Policy language and, at the same time, ensured that customers with the same listed characteristics were treated alike.  Prestegaard ¶ 3; Hudson ¶ 76.

This entire practice of assigning each Insured's rate based on characteristics listed in the company's rate tables was consistent with industry practice, Reynolds at 20; Dahlen ¶ 4, as well as with expectations of state insurance regulators, who require the submission and approval of insurance forms sold to customers in their respective states, Hudson ¶¶ 26-27.  Insurance products are subject to strict oversight by state insurance regulators—both as to the framework used by an insurer to develop its underlying rate tables (discussed in the next section) and as to the form of insurance—the Policy language.  The latter form of regulatory oversight includes "careful[] examin[ation]" by regulators of proposed Policy language.  *Id.* ¶¶ 74, 97.

This same framework applied to the sale of the Policy in California.  "California has enacted comprehensive legislation expressly designed to regulate the business of insurance."  *American Int'l Group, Inc. v. Superior Court*, 234 Cal. App. 3d 749, 764 (1991) (California requires illustrated life insurance rates to be subject to rigorous testing and reserve requirements); Cal. Ins. Code §§ 10509.955(b)(9)-(10) (requiring illustrated rates to be self-supporting).  In California, the Department of Insurance requires insurers proposing to offer a life insurance policy such as Universal Life to submit the Policy form and related materials before offering insurance on that form in California.  Hendren ¶ 20; Hudson ¶ 90.  Consistent with this regulatory scheme, State Farm submitted its proposed Policy form, known as Form 94030, to the Department of Insurance, along with relevant supporting materials.  *See* Hendren ¶ 20 & Ex. F.  State Farm begin selling the Policy in California thereafter.  *Id.*; Hudson ¶ 58.

The testimony of Mary Jo Hudson, formerly an Executive Committee member of the National Association of Insurance Commissioners ("NAIC") and a state insurance commissioner, confirms that, consistent with the plain language and industry practice, regulators understood "age …, sex, and applicable rate class" language like that used in the State Farm Policy to refer to the process by which the insurer selects each Insured's rate from the insurer's underlying rate tables.  Hudson ¶ 76.  It also means that Insureds with the same age, sex, and rate class are treated alike.  *Id.*  Regulators do *not* understand this language to refer to the earlier process by which an insurance company establishes its underlying rate structure and rate tables in the first instance (*id.*, ¶ 73)—a process described more fully in the next section.

## 2. State Farm's Process for Establishing its Underlying Cost of Insurance Rate Structure and Rate Tables Applicable to All Insureds Under the Policy

The process of assigning a rate to an individual Insured is distinct from the process by which State Farm establishes its underlying cost of insurance rate structure and rate tables.  The latter process for this Policy was the result of over two years of deliberative product design and pricing work at State Farm.  Hendren ¶¶ 2, 7–8, 13.  State Farm actuaries—professionals who analyze the financial consequences of risk—evaluated State Farm's experiences with expenses, mix of business, mortality, and other relevant factors to develop products and prices that would be competitive in the marketplace and compliant with actuarial standards and applicable regulations, and ultimately developed rate tables to be used for the Policy.  Hendren ¶ 13.  After the intended product design and policy form language were complete, State

1    Farm began the process of seeking regulatory approval to offer the product to consumers.  Hendren ¶ 17.

2    State insurance regulators expect life insurers to follow sound actuarial principles in setting their

3    insurance rates.  Hudson  ¶ 97; Hendren ¶¶ 8–11.  That means rates must be sufficient for the company to

4    operate beyond just paying death benefits on each policy.  *Id.*  ¶ 98; Hendren ¶¶ 8–11.  Among other things,

5    rates must cover premium taxes, financial reserves, agent commissions, employee salaries and benefits,

6    and  compliance  with  regulatory  financial  surplus  requirements.   *Id.*   Regulators  expect  rates  to  be

7    sufficient to cover these and other costs, as it is essential that insurers remain financially sound and are

8    able to meet their obligations to policyholders in both the short and long term.  *Id.*

9    The rate-setting process for life insurers like State Farm also is informed by standards of practice

10   published  by  the  Actuarial  Standards  Board  of  the  American  Academy  of  Actuaries  and  Society  of

11   Actuaries.  Hendren  ¶¶ 2, 12, 22; Reynolds at 10.  In establishing cost of insurance rates for a Universal

12   Life product, actuaries must consider a range of "experience assumptions"—*i.e.*, assumptions about the

13   insurer's "costs of providing the insurance to the customer, and other important variables."  Hendren  ¶ 12.

14   Notably,  the  development  of  the  company's  underlying  rate  structure  takes  into  account  pooled  data

15   related to potential insureds *as a group*, not by reference to particular individual insureds.  State Farm

16   takes into account, by reference to all potential Insureds, "anticipated premium payments, policy surrender

17   rates, mix of business by sex and rate class, and morality rates, among others."  *Id.*  ¶ 13.  State Farm also

18   considers costs related to the operation of the company itself, including the "cost of doing business (e.g.,

19   employee salaries and agent commissions etc.), earned interest rates, inflation rates, tax rates, regulatory

20   reserve and surplus requirements, among many others."  *Id.*

21   The consideration of these factors in establishing an insurer's underlying rate tables is consistent

22   with common actuarial pricing methods that are used industry-wide.  Reynolds ¶¶ 22–23; Hendren ¶¶ 8–

23   11.  By contrast, if a policy form offered a rate structure that did *not* take these factors into account, that

24   form likely would not have been approved by state insurance regulators, who expect and require insurers

25   to consider "operational expenses, reserves, and other necessary factors in the development of its cost of

26   insurance rate structure" so as ensure the product's financial viability.  Hudson ¶¶ 94, 99.  Once the

27   underlying rate structure is established pursuant to these standards, State Farm creates tables of established

28   monthly cost of insurance rates that are organized by age, sex, and rate class.  Hendren ¶ 7; Reynolds at

30.  As noted above, it is from these rate tables that each individual Insured's rate is identified in the application process, based on that person's "age on the policy anniversary, sex, and applicable rate class." Hendren ¶¶ 25–32.

As discussed below, Plaintiff makes certain incorrect factual assertions about the manner in which State Farm set its cost of insurance rates vis-à-vis certain categories of insureds.  Specifically, she asserts, and her expert also assumes, that State Farm did not differentiate among its insureds based on their use of tobacco, and that it did differentiate among insureds based on how long each Insured held his or her policy— sometimes referred to as "duration," a concept that recognizes that the further from the underwriting process a customer is, the more likely it is that their health has changed.  But both of these factual assumptions are demonstrably untrue.  As shown by the undisputed record evidence, including the rate tables and the "Tobacco" or "Non-Tobacco" designation on the face of each and every Universal Life policy, including Plaintiff's (*see* Ex. A at 3), whether an Insured used tobacco was a critical factor that State Farm used to establish separate rate classes or underwriting classes for all insureds under this Policy.  Hendren ¶¶ 28–34; Hudson ¶ 48; Lopez ¶ 8; Prestegaard ¶¶ 3, 8.  And State Farm, unlike some other insurers, did *not* differentiate on the basis of how long each Insured held the policy—rather, it determined each Insured's rate by reference to that person's "age on the policy anniversary," so a person buying the policy in a given year would pay the same rate as someone with the same age, sex, and rate class who had held the policy for many years.  Hendren ¶¶ 27, 33

### 3.    The Role of "Mortality" in Reading the Policy

An important question presented by Plaintiff's contract theory is what role, if any, the concept of "mortality" plays in interpreting the phrase "the Insured's age on the policy anniversary, sex, and applicable rate class" in the Policy's cost of insurance clause.  Plaintiff argues, and her damages expert assumes, that when the Policy uses that phrase, it really means "mortality"—a device that Plaintiff's expert then uses to set up an alternative rate structure and damages model derived from State Farm's general "mortality tables."  And because those tables do not themselves reference any actual rates, Plaintiff's expert proceeds to build an entirely new cost of insurance rate structure by taking the mortality tables and then translating them into an alternative rate structure—one that considers factors other than age, sex, and rate class, and that also disregards a critical component of "rate class," namely tobacco use.

Gibson, Dunn & Crutcher LLP

But the premise of this exercise is simply wrong, because the phrase "the Insured's age on the policy anniversary, sex, and applicable rate class" cannot plausibly be read as referring to general "mortality tables" or "mortality assumptions" that form an early input into State Farm's ratemaking process.  Among other reasons, the mortality tables consist merely of percentages reflecting the likelihood that insureds of a certain age and with certain characteristics will pass away in a given period.  Hendren ¶ 33.  They do not reference rates, or any particular "Insured's" age or sex, and they certainly do not reference "rate class" at all, much less "applicable rate class"—a phrase that comes into play only when a particular Insured is assigned a rate class through the underwriting process.  *Id.*  This latter point is not surprising when one considers that rate classes generally are what ***result*** from the ratemaking process— they are not ***inputs*** that go into that process at the beginning.  It is only once the overall rate structure is established that rates are divided into tables by age, sex, rate class, such that the rates can then be assigned to individual Insured's "based on" those factors, including the critical Tobacco/Non-Tobacco distinction. *Id.* ¶¶ 16, 31, 33–34; Prestegaard ¶ 9.

That the words "based on the Insured's age on the policy anniversary, sex, and applicable rate class" do not mean "based on mortality projections" or similar formulations is confirmed by another sentence later in the cost of insurance paragraph stating that the company's rates "*may be adjusted for projected changes in mortality* but cannot exceed the maximum cost of insurance rates."  Ex. A at 10 (emphasis added).  This shows that the Policy could have used the words "projected … mortality" in describing how the company would establish its rates in the first instance, either generally or as applied to an individual Insured, but it did not use those words.  Instead, it used words tied to each individual Insured—namely, "the Insured's age on the policy anniversary, sex, and rate class," *i.e.*, the "underwriting class of the person insured."  Ex. A at 4, 10.

Other Policy provisions also reflect the distinction between State Farm's process for establishing its underlying cost of insurance rate tables and the later process of assigning a specific rate to an individual Insured from those underlying tables.  For example, in addition to the process of establishing applicable cost of insurance rates, State Farm separately develops and supports a set of "maximum rates" for the cost of insurance for any given policy.  ¶¶ 10–11, 25.  These maximum rates are submitted to state regulators, and are shown on page 4 of the Policy.  Ex. A at 4; Hendren ¶¶ 10, 17; Hudson ¶¶ 90, 105.  And,

DEFENDANT STATE FARM'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:18-CV-04954-CRB

significantly, these rates, like the rate tables, are specifically organized by age, sex, and rate class.  Ex. A at 4; Hendren ¶¶ 25–26, 31.  As to these rates, the Policy states—in the same paragraph as the at-issue language—that it will not charge a rate *higher* than these maximum rates.  Ex. A at 10.  This language tells the Insured that he or she will not pay more than the maximum rates listed on page 4 of the policy.  Hendren  ¶ 11.  Plaintiff does not contend that State Farm ever charged her or any class member more than the listed maximum rate.

### 4. The Role of Annual Notices

Apart from the policy documents created at the time of purchase, State Farm sends every Universal Life policyholder an annual notice describing that person's policy value on the policy anniversary.  Dahlen ¶ 18.  The notice shows the deductions made in the year, including for cost of insurance charges.  *Id.*  State Farm agents often review these annual notices with customers, providing multiple additional opportunities for agents to answer any questions and to explain that State Farm's cost of insurance charges serve the purpose of generating revenue to cover State Farm's expenses and allowing it to provide a financially viable insurance product for all policyholders.  *Id.* ¶¶ 18–19; Lopez ¶ 10.

### C. Procedural History

Plaintiff filed her complaint in August 2018, seeking to represent a state-wide class of all persons who "own or owned [the Policy] in the State of California," asserting claims for breach of contract, conversion, and declaratory and injunctive relief, and demanding compensatory and punitive damages.  In May 2019, before any class was certified, State Farm moved for summary judgment on Plaintiff's individual claims, arguing that it was entitled to judgment as a matter of law under a line of cases principally from the Seventh Circuit, including *Norem v. Lincoln Benefit Life Ins. Co.*, 737 F.3d 1145 (7th Cir. 2013) and *Thao v. Midland Nat'l Life Ins. Co.*, 549 F. App'x. 534 (7th Cir. 2013).  *Norem* and *Thao* both held that a cost of insurance provision like the one at issue here did not preclude the insurer from considering factors other than mortality in setting its rates.  Dkt. 63.  State Farm's motion relied on these and other precedents and the Policy itself.  State Farm also presented the argument set out in the present opposition—that the at-issue language refers to the process by which each Insured is assigned a cost of insurance rate.  *Id.* at 19–20.  After briefing, this Court denied State Farm's motion in a written decision that, as discussed below, forms the sole basis for much of Plaintiff's current motion.  Dkt. 77.  In its ruling, the Court focused on State Farm's

1    arguments under *Norem* and did not address its second argument.  *Id*.  The Court also did not have before it

2    the extensive factual and expert evidence presented with this opposition.

3            On April 2, 2020, the Court granted Plaintiff's motion for certification of a California class.  Dkt.

4    122.  Plaintiff's current motion for summary judgment seeks a ruling as a matter of law on contract

5    interpretation, breach, and entitlement to damages, as well as a ruling that State Farm is bound as a matter

6    of law by certain factual assumptions made by her damages expert, Scott Witt, in his report submitted in

7    the earlier *Vogt* case.  Plaintiff also asks the Court to rule in favor of all class members, as a matter of law,

8    on State Farm's affirmative defenses of statute of limitations and setoff.

9            On November 12, 2020, after filing her motion, Plaintiff disclosed a single expert—Mr. Witt—

10   offering opinions solely on damages.  She did not submit this report to the Court in support of her motion,

11   but did cite a prior report by Mr. Witt submitted at the class certification stage, as well as Mr. Witt's report

12   from *Vogt*.  *See supra* note 1.  On December 21, State Farm submitted the reports of four experts—Craig

13   Reynolds (actuarial standards); Mary Jo Hudson (former NAIC executive and state insurance

14   commissioner); Lauren Stiroh (economics and damages expert); and Rebecca Kirk Fair (consumer

15   expectations).  State Farm also submits the declarations of Amy Prestegaard, Ross Lopez, Reg Dahlen,

16   and Alan Hendren—State Farm declarants with personal knowledge and information bearing on the

17   present motion.  This fact and expert evidence was not before this Court when it ruled on State Farm's

18   earlier summary judgment motion.

19                               **III.  LEGAL STANDARD**

20           "Summary judgment is appropriate only if, taking the evidence and all reasonable inferences in

21   the light most favorable to the non-moving party, there are no genuine issues of material fact, and the

22   movant is entitled to judgment as a matter of law." *Tauscher v. Phoenix Bd. of Realtors*, 931 F.3d 959,

23   962 (9th Cir. 2019); Fed. R. Civ. P. 56(a).  Any disputed facts that might allow a reasonable trier of fact

24   to rule for the nonmovant constitute genuine issues of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477

25   U.S. 242, 248 (1986).  The moving party carries the initial burden of establishing the absence of any

26   genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

27           When more than one party moves for summary judgment, a court must evaluate each motion "on its

28   own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir.

2001); 10A C.A. Wright et al., Fed. Prac. & Proc. § 2720 (4th ed. 2020).  As the Ninth Circuit has explained, "the denial of a summary judgment motion is never law of the case because factual development of the case is still ongoing." *Peralta*, 744 F.3d at 1088.  Indeed, the "[d]enial of summary judgment may result from a factual dispute at the time," but "[t]hat dispute may disappear as the record develops.  *Id.*  And certainly one party's failure to meet its burden on its own summary judgment motion "does not automatically indicate that the opposing party has satisfied its burden and should be granted summary judgment on the other motion."  Wright et al., *supra*, § 2720; *accord Fred Segal*, *LLC v. CormackHill, LP*, 821 F. App'x 783, 786 (9th Cir. 2020) (reversing summary judgment where "district court erroneously believed that" the denial of the nonmovant's motion "requir[ed] it to grant" movant's motion); *accord* N.D. Cal. Civil L.R. 56-3 ("Statements contained in an order of the Court denying a motion for summary judgment … shall not constitute issues deemed established for purposes of the trial of the case, unless the Court so specifies.").  Rather, this Court must consider whether Plaintiff's current motion itself meets the summary judgment standard.  *See Fair Hous.*, 249 F.3d at 1136; Wright et al., *supra*, § 2720.

These rules apply to breach of contract claims under California law, including its unique rules regarding the use of extrinsic evidence.  In particular, California law requires that courts consider extrinsic evidence *both* when deciding if the contract language bears more than one reasonable interpretation, and when seeking to resolve any such ambiguity using rules of construction.  "Only if these rules do not resolve a claimed ambiguity [can the Court] resort to the rule that ambiguities are to be resolved against the insurer." *Minkler*, 49 Cal. 4th at 321; *AIU Ins. Co.*, 51 Cal. 3d at 822.  Summary judgment may not be granted where fact or expert witness declarations support the non-movant's reasonable interpretation or raise a question of material fact as to the intended meaning of the contact language.  *Universal Green Sols., LLC v. VII Pac Shores Inv'rs, LLC*, 2014 WL 1994880, at *4 (N.D. Cal. May 15, 2014) (denying summary judgment where non-movant "offer[ed] detailed testimony" regarding the mutual intent of the parties, which testimony had to be weighed against ambiguous contract language).

Under California's multi-step approach to assessing and resolving questions of contract interpretation, a court assessing a summary judgment motion must first "provisionally receive[]" fact witness testimony to decide if the non-movant's interpretation is reasonable—meaning, whether there are two or more reasonable interpretations. *Tessera, Inc. v. UTAC (Taiwan) Corp.*, 2016 WL 8729937, at *5–

6 (N.D. Cal. Jan. 15, 2016); *Phoenix Techs. Ltd. v. VMWare, Inc.*, 2017 WL 1289863, at *3 (N.D. Cal. Jan. 6, 2017).  If so, then at the second stage of *resolving* the ambiguity, summary judgment is improper "if the interpretation turns upon the credibility of conflicting extrinsic evidence, or if construing the evidence in the nonmovant's favor, the ambiguity can be resolved consistent with the nonmovant's position… ." *Miller v. Glenn Miller Prods, Inc.*, 454 F.3d 975, 990 (9th Cir. 2006) (citing cases) (internal citations omitted).  Summary judgment also is inappropriate where testimony from relevant industry and regulatory sources "support the non-moving party's case." *Provenz v. Miller*, 102 F.3d 1478, 1490–91 (9th Cir. 1996).  So long as conclusions are reasonably supported, *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995), such testimony establishes a genuine dispute of material fact, and summary judgment is inappropriate.  *See Sonner v. Schwabe N. Am.*, 911 F.3d 989, 992 (9th Cir. 2018).

## IV.  ARGUMENT

### A.    Plaintiff Is Not Entitled to Summary Judgment on Her Breach of Contract Claim

Plaintiff asks this Court to enter judgment against State Farm *as a matter of law* on the central issue in this case—whether State Farm breached its contract with Universal Life policyholders insured on Form 94030.  She rests her entire liability case for all of her claims on the proposition that this Court, in its order denying State Farm's prior summary judgment motion, "determined as a matter of law that the Policy's cost of insurance rates provision is ambiguous … and must be construed in favored of the insured" such that the Class is automatically "entitle[d] to summary judgment." Mot. 7–8.  Plaintiff is wrong as a matter of fact and law, for several reasons.

*First*, the plain text and overwhelming evidence concerning the Policy's monthly cost of insurance provision make clear that State Farm complied with this provision, which refers straightforwardly to the process by which each Insured's cost of insurance rate is identified from State Farm's underlying cost of insurance rate tables.  Accordingly, State Farm fully complied with the cost of insurance provision because it looked exclusively to "the Insured's age on the policy anniversary, sex, and rate class" to determine each Insured's cost of insurance rate.

*Second*, Plaintiff's attempt to rewrite this language as a limitation on the factors State Farm can consider in developing its underlying cost of insurance rate structure—a process that took over two years to create and was subject to regulatory oversight and strict actuarial standards—is contrary to the text and to

the relevant extrinsic evidence and industry practice, and would conflate two very different processes with distinct purposes.  It also would make no sense as an economic matter and would produce rates that would not comply with regulatory expectations or actuarial standards of practice, absent significant changes in other parts of the rate structure that Plaintiff's model does not make.

*Third,* even if the cost of insurance phrase could be read to refer to State Farm's underlying actuarial process of developing its underlying rate tables, Plaintiff's proposed reading of the words "based on" to demand exclusivity in that context would be absurd and unworkable, rendering it objectively unreasonable.

*Finally*, nothing in this Court's prior ruling on *State Farm*'s summary judgment motion—made at the outset of the case, before class certification, and without a factual record, provides Plaintiff with any basis for a ruling "as a matter of law" in favor of the class.  The Court's ruling did not make any summary judgment ruling for Plaintiff at all, much less "as a matter of law."  Nor could it have done so, given the need under California law to consider relevant extrinsic evidence in the process of interpreting insurance policy language.  Each of these points is discussed more fully below.

### 1.    California Law Requires Consideration of Both the Text and Any Relevant Extrinsic Evidence In Interpreting a Contract, Including an Insurance Policy

In California, contract interpretation is largely a legal question for the Court,[3] which must consider the parties' mutual intent at the time of formation.  Cal. Civ. Code § 1636.  The California Supreme Court mandates a two-step process in evaluating a contract.  The Court first tries to determine the parties' mutual intent from the text of the Policy, taking the language in question "in the context of that instrument as a whole, and … not in the abstract."  *Bank of the West. v. Superior Court*, 2 Cal. 4th 1254, 1265 (1992).  "Of equal importance is the rule that '[a] contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect."  *Quantification Settlement Agmt. Cases*, 218 Cal. App. 4th 758, 798 (2011); *Eucasia Sch. Worldwide, Inc., v. DW Aug Co.*, 2018 Cal. App. 4th 176, 182 (2013).

Under California law, contract language is deemed ambiguous only if, *after* considering any relevant extrinsic evidence proffered by the parties, the Court finds that contract "is capable of two or

---

[3]   Although contract interpretation generally is a question of law, *Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 865 (1965), the jury resolves questions as to the intent of the parties where credibility issues are presented.  *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 395 (2008).

Gibson, Dunn &
Crutcher LLP

more constructions both of which are reasonable." *Pacific Gas*, 69 Cal. 2d at 34; *Suarez v. Life Ins. Co. of N. Am.*, 206 Cal. App. 3d 1396, 1402 (1988).  As the California Supreme Court noted in *Pacific Gas*, the test for extrinsic evidence is not whether the text is ambiguous on its face, but "whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." 69 Cal. 2d at 34.  "If a party's extrinsic evidence creates the possibility of ambiguity, a court may not rely on the text of the contract alone to determine the intent of the parties."  *Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 828 (9th Cir. 2001).  By the same token, if a party offers an interpretation that is *not* objectively reasonable, the Court can reject the assertion of ambiguities.  *A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc.* 852 F.2d 493, 497 n.2 (9th Cir. 1988); accord *Miller*, 454 F.3d at 989–91.

If the Court finds the contract language susceptible two or more reasonable interpretations, it must try to resolve the ambiguity using the proffered extrinsic evidence, *Westport Inn Corp. v. N. Cal. Relief*, 76 F. Supp. 3d 869, 878 n.6 (N.D. Cal. 2014) (Breyer, J.), as well as accepted tools of construction, *Int'l Brotherhood of Teamsters v. NASA Servs.*, 957 F.3d 1038, 1042–43 (9th Cir. 2020).  In an insurance case, the Court interprets ambiguous provisions "in the sense that the promisor (i.e., the insurer) believed the promisee understood them at the time of formation." *AIU Ins. Co.*, 51 Cal. 3d at 822 (citing Cal. Civ. Code § 1649); *see also Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 737 (1993) (language must be "interpreted in the sense the insurer believed the insured understood it at the time of formation"). Crucially, although California law allows courts to use the "tie-breaker" rule that construes ambiguity against the drafter, that rule is triggered only if all other rules "do not resolve a claimed ambiguity." *Minkler*, 49 Cal. 4th at 321; *AIU Ins. Co.*, 51 Cal. 3d at 822.  Thus, Plaintiff's suggestion that the Court apply this rule without considering State Farm's extrinsic evidence, Mot. 6, is an invitation to error.

The extrinsic evidence the Court considers in this process includes evidence as to the  industry and regulatory context in which the contract arises.  *See generally Grow Group, Inc. v. North River Ins. Co.*, 1992 WL 672265, at *3 (N.D. Cal. Aug. 14, 1992).  The Court will consider evidence and "documents which reflect the understanding of the industry," *id.*  at *3–4 (citing *Fireguard Sprinkler Sys., Inc. v. Scottsdale Ins. Co.*, 864 F.2d 648, 652 (9th Cir. 1988)), as well as any relevant "industry custom" bearing on the interpretive question, *see Wolf*, 114 Cal. App. 4th at 1357-60 (trial court erred in granting summary adjudication where industry expert's statements provided an "alternative interpretation to which the

[contractual language] was reasonably susceptible"); *Nationwide Agribusiness Ins. v. George Perry & Sons, Inc.*, 338 F. Supp. 3d 1063, 1073 (E.D. Cal. 2018) (denying summary judgment where extrinsic evidence of "industry custom" supported "the existence of a genuine dispute of material fact" on the meaning of the contract).[4]   And the regulatory context of a "heavily regulated" industry such as insurance must also be considered.  *See Paul Revere Variable Annuity Ins. Co. v. Kirschhofer*, 226 F.3d 15, 23–24 (1st Cir. 2000); *accord Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 439–40 (1st Cir. 2013); *Bruce Foods Corp. v. Tex. Gas Serv.*, 2014 WL 652312, at *21 (W.D. Tex. Feb. 19, 2014).   The Court must avoid a reading that is illegal under, or even at odds with, relevant insurance laws and rules, including model laws issued by the NAIC.  *Kirschhofer*; 226 F.3d at 24; *see also Heppler v. J.M. Peters*, 73 Cal. App. 4th 1265, 1278 (1999).

### 2.    The Plain Policy Text and Overwhelming Extrinsic Evidence Support State Farm's Reading of the Policy

Both the text of the Policy and the relevant extrinsic evidence overwhelmingly support State Farm's interpretation of the at-issue Policy provision.  That provision states that "These rates for each policy year are based on the Insured's age on the policy anniversary, sex, and applicable rate class." Ex. A at 10.  As shown above, this language explains to each policyholder that the Insured's rate for each year in which the policy is held (the "policy year" applicable to that Insured) will be "based on" his or her individual characteristics—specifically the Insured's age on the anniversary of that Insured's assigned "policy date," the sex of that Insured, and the rate class or "underwriting class" as determined for that Insured through the underwriting process. *Id.* at 4, 10.  Each of the terms in this clause refers to the specific, individual "Insured" named in that person's Policy.  The "Insured" is identified in each Policy as the person whose life is the subject of the Policy.  *See* Ex. A at 1 (identifying Megan J. Bally as the "Insured" on Plaintiff's Policy).  The Policy states that the "policy year," "policy month," and "policy anniversary" are each measured from the "policy date," defined to mean "[t]he effective date" of the subject Policy—that is, the policy for *that Insured*.

---

[4]   Under California law, extrinsic evidence of customary usage is not limited to situations where both parties are engaged in the trade or industry.  "[T]he party offering customary usage" need only show that the parties "had actual or constructive notice of the customary usage." *Universal Cable Prod., LLC v. Atlantic Specialty Ins. Co.*, 929 F.3d 1143, 1154 (9th Cir. 2019).  Here, individual customers were advised that their rates would be assigned by reference to their age, sex, and underwriting class, and each customer also went through the underwriting process before being assigned a final rate class, Dahlen ¶¶ 9, 15, so customers were on notice that their rates would be assigned by reference to these factors.

DEFENDANT STATE FARM'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:18-CV-04954-CRB

Gibson, Dunn & Crutcher LLP

*Id.* at 5.  On its face, this language tells each customer that the Insured's rate will be based on his or her individual characteristics, and also makes clear that the rate will change annually as a result of the Insured's increase in age on the annual date of the "policy anniversary," *i.e.*, the anniversary of the start date of the policy *naming that Insured*.  Stated differently, the "cost of insurance" provision makes clear that the specific cost of insurance rate applicable to an individual Insured is "based upon" his or her personal characteristics.  As such, the language on its face is susceptible to only one reasonable interpretation—that the individual factors State Farm will consider for each Insured in setting his or her cost of insurance rate are his or her age on each policy anniversary, sex, and applicable rate class as determined through the underwriting process.  Indeed, the provision points to a chart of maximum rates (found at page 4 of the Policy) that break down by age, sex, and rate class (Ex. A at 4)—and the cost of insurance rate tables that State Farm provides to agents and uses to assign rates to each individual Insured is organized in precisely the same fashion, by age, sex, and rate class (Hendren ¶ 25 & Ex. A).

The express reference to an individual Insured's "applicable rate class" confirms that the provision refers to the process of selecting an individual's rate from rates that were developed at an earlier time.  The use of the word "applicable" indicates that rate *classes* already exist, and that the individual Insured is to be designated an "applicable" class from these existing classes.  That is consistent with the Policy's definition of "rate class" as "the underwriting class *of the insured*."  Ex. A at 5.  More fundamentally, rate classes are developed as a *result* of State Farm's process in developing a cost of insurance rate structure in the first instance, and are not themselves the inputs into that process.  Hendren ¶¶ 6–7.  For example, tobacco use is a critical determinant for an Insured's rate class, and defines a significant rate class division among adult insureds between "tobacco" and "non-tobacco" use.  *Id.* ¶¶ 28–29, 33; Prestegaard ¶¶ 3, 8.  But these rate classes are developed before the process by which any individual Insured's "applicable rate class" is designated through the individual underwriting process.

This interpretation is further confirmed by State Farm's evidence related to the pricing and sale of its Universal Life product and the underwriting process—evidence that the Court must consider in establishing how State Farm reasonably believed an Insured would understand the cost of insurance provision.  *AIU Ins. Co.*, 51 Cal. 3d at 822; *Shell Oil*, 12 Cal. App. 4th at 737.  As this evidence shows, policyholders seeking to purchase the Policy at issue did so in almost all instances through a one-on-one

1   meeting with a State Farm agent or licensed and trained agent employee.  Dahlen ¶ 6; Lopez ¶ 5; Prestegaard

2   ¶¶ 4–6.  During this process, after determining that it might be a good fit in light of the customer's needs,

3   the agent would explain the Policy, including its key features and charges.  Dahlen ¶¶ 6–7; Lopez ¶¶ 6–9.

4   As described above, agents typically explained what rate—from State Farm's preexisting rate tables—he or

5   she likely would be assigned based on his or her age on each policy anniversary, sex, and likely rate class,

6   taking into account initial health information.  Dahlen ¶ 12; Prestegaard ¶ 6; Kirk Fair  ¶¶ 57–59.  The agent

7   would do this as an indivualized presentation, by reference to the rate tables agents are given by State Farm

8   that, as discussed above, show cost of insurance rates broken down by age, sex, and rate class.  Dahlen  ¶ 11.

9   The agent then explained that the Insured would have to go through an underwriting process to determine

10  the Insured's final rate class.   Dahlen ¶ 15; Prestegaard  ¶ 6; Kirk Fair ¶¶ 57–59.  It is through this

11  underwriting process that State Farm confirms additional health characteristics that may affect the Insured's

12  applicable rate class and the rates that will apply to him or her.  Prestegaard ¶ 7; Kirk Fair ¶ 69.  Because the

13  agent and underwriting process involves one-on-one interactions with each customer, the process is

14  inherently individualized, but customers are fully advised, and understand, that the applicable cost of

15  insurance rate is based on these individual characteristics.  Dahlen  ¶¶ 12–13, Kirk-Fair  ¶ 69.

16      Once the underwriting process is complete and the Insured's applicable rate class determined, that

17  information, together with the Insured's age and sex, establishes the Insured's monthly cost of insurance

18  rate going forward, subject to changes within the existing rate tables on the Insured's policy anniversaries,

19  and to changes State Farm may make under the Policy's terms.  Ex. A at 10; Dahlen  ¶ 12.  Notably, State

20  Farm never raised its cost of insurance rates for the Policy, and in 2002, it lowered them.  Hendren ¶ 11.

21      State Farm's reading of the "cost of insurance" provision also is consistent with industry standards

22  and regulatory expectations.  Both Craig Reynolds, the former President of the Society of Actuaries, and

23  Mary Jo Hudson, a former leadership member of the National Association of Insurance Commissioners

24  and former head of a state insurance department, confirm that the at-issue language—referring to the

25  "Insured's age on the policy anniversary, sex, and applicable rate class"—describes the process of

26  determining each individual Insured's rate from the company's underlying cost of insurance rate tables,

27  and not to the very different process of developing those rate tables in the first instance in connection with

28  the product design process.  Reynolds at 5; Hudson ¶¶ 72–73, 82.  This testimony from industry and

regulatory experts echoes what the other relevant evidence shows—that State Farm complied with the plain text of the Policy by selecting each Insured's rate from the rate tables based on that person's age on each Policy anniversary, sex, and applicable rate class or "underwriting class" as assigned to that Insured through the underwriting process.  At a minimum, this evidence creates a triable issue as to whether the at-issue provision refers to the assignment of an Insured's rate, or the separate process by which State Farm develops its rate tables.  *See*, *e.g.*, *Miller*, 454 F.3d at 990; *Wolf*, 114 Cal. App. 4th at 1357–60.

Faced with similar policy language and extrinsic evidence, the only court to have carefully considered this specific issue[5] recognized the same distinction between an insurer's development of its underlying rate tables and the selection of an *individual's* rate from the company's rate tables by reference to that person's characteristics as specified in a cost of insurance provision.  In *Norem*, the Seventh Circuit recognized that insurers "consider[] numerous factors when setting the COI rate scales (a practice that is standard in the insurance industry)" and that it is common industry practice for "actuaries [to] test different pricing scenarios, the specifics of which are proprietary in nature and are not disclosed to policyholders or the public at large." 737 F.3d at 1150; *see also Thao*, 549 F. App'x at 537–38 (recognizing distinction between the "named factors which serve to both differentiate one insured from another and insure that similarly situated insureds will be treated alike" and "other, unidentified factors that [an insurer] considers in setting the cost of insurance rates"). "Critically for [the] analysis," the characteristics "enumerated in the policy itself" are "precisely those characteristics that demonstrate how a COI rate is likely to vary from one individual policyholder to the next." *Norem*, 737 F.3d at 1150.  Exactly the same conclusion applies here.

### 3. Plaintiff's Contrary Reading Finds No Support in the Policy Text and Would Contravene Settled Industry, Actuarial, and Regulatory Standards

As State Farm's evidence also overwhelmingly shows, Plaintiffs' argument that the "cost of insurance" provision refers to the process by which State Farm develops its underlying cost of insurance rate tables is contrary to the text of that provision, the undisputed industry understanding of such provisions, and the understanding of regulators who review policy forms before insurance under those forms may be sold to the public.  Each of these sources verifies that the reference to the Insured's "age on

---

[5]  Other courts have addressed the phrase "based on" in other cost of insurance provisions, but their analysis focused on whether the words "based on" imply exclusivity, a separate issue from whether a cost of insurance provision like the one here even refers to the company's ratemaking process.

DEFENDANT STATE FARM'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:18-CV-04954-CRB

the policy anniversary, sex, and applicable rate class" does *not* refer to the creation of the underlying cost of insurance rate tables or rate structure established before the specific Insured is even identified.  *See* Reynolds at 5; Hudson ¶¶ 72–73, 82; Hendren ¶ 34; Dahlen ¶¶ 4, 13.   That is so, not only because the text cannot reasonably be read to say that, but also because reading it that way would make no economic, actuarial, or regulatory sense, absent significant changes elsewhere in State Farm's rate structure.

For one, to accept Plaintiff's argument, the Court would have to ignore the fact that State Farm's underlying rate structure was generated well before the company had any particular Insured's age, sex, and rate class information.  And, as noted above, the words "rate class" or "underwriting class" are not even mentioned in the mortality tables Plaintiff tries to use to translate these factors into alternative rates. There is a simple reason for this.  "Rate class" categories are the *end result* of the ratemaking process for a Universal Life product and do not define the initial inputs used to develop them.  The Court also would have to ignore the fact that the Policy language refers to only one insured ("the Insured"), not all insureds as a group, and that it is group data that State Farm must consider to develop its underlying rate structure. And Plaintiff's reading does not even key off the operative language—namely an Insured's "age," "sex," and "rate class."   Rather, Plaintiff tries to revise this language as a prohibition on any consideration of "non-mortality loads" and as requiring that rates be based on State Farm's "mortality" table.  Such an interpretation does not follow from the Policy's text, and completely ignores the fact that "rate class" is not even mentioned in the mortality table on which Plaintiff's argument is based.  Mot. 12, 14.  This disconnect between the mortality table and the Policy text carries over into Plaintiff's damages model, which (1) disregards a key driver of "rate class," or "underwriting class," namely the distinction beween "Tobacco" and "Non-Tobacco"; and (2) expressly relies on "mortality factors" *other than* "age on the policy anniversay, sex, and applicable rate class," such as how long the policyholder held the Policy.

In sum, Plaintiff is not offering a reasonable interpretation of the Policy language, but instead is asking the Court to rewrite the language to state the following:

> "These rates for each policy year are [*developed in the first instance*] based [*solely*] on the [*mortality factors applicable to all insureds, including all insureds'*] age[*s*] on their [**ir** *respective*] policy anniversar[*ies*]y, sex[*es*], [*length of time each Insured held the policy*], and applicable rate class[es][*, excluding any consideration of tobacco use*]."

This is not a proper invocation of the judicial function, under California law or otherwise.  Plaintiff's argument about the meaning of the at-issue language should be rejected because it would require the Court to rewrite the Policy and is objectively unreasonable.

The unreasonableness of what Plaintiff asks this Court to do is confirmed by the fact that, even if the Policy could be rewritten in this way, the revised provision would not pass regulatory muster.  Plaintiff's argument that the "age, sex, and rate class" language at issue refers to the process of setting the company's rates in the first instance, that the three listed factors (which she translates into meaning exclusively "mortality expectation") are all that can be considered in that process, and that no other adjustments can be made to cover State Farm's other revenue requirements would be contrary to governing actuarial and regulatory requirements, which require insurers to follow strict actuarial principles in setting their underlying cost of insurance rates—including by making provisions for recovery of operating expenses, reserves, and funds to ensure the company's continued financial strength.  Those requirements would *not* allow rates set in the artificial and self-serving way proposed by Plaintiff and Mr. Witt.  Reynolds at 29–30; Hudson ¶¶ 103–06.  Not surprisingly, Plaintiff provides no support for her contention that including "loads" for other factors—such as expenses, capital reserve requirements, taxes, profit, and investment earnings, in the cost of insurance rate structure—is somehow "impermissible."  Compl. ¶ 37; Mot. 7.  In fact, the evidence shows that such a practice is common and necessary for an actuarially sound cost of insurance rate structure.

As Mr. Reynolds explains, any proposal to jettison the comprehensive actuarial process used to develop an insurer's tables for a product, and instead base the entire underlying rate structure solely on Insureds' age, sex, and rate class, would contravene industry-wide standards and sound actuarial practices.  Reynolds at 5–6.  In particular, binding actuarial standards embodied in the Actuarial Standards of Practice, or ASOPs, require that an insurer's underlying cost of insurance rates be developed "consistent with the insurer's stated marketing, financial, and other objectives[, including] to obtain a reasonable level of profitability."  *Id.* at 22; Hendren ¶¶ 12, 22.  General industry practice looks to factors other than mortality expectations to develop cost of insurance rates, and is in fact "one of the rudimentary aspects of actuarial training and education."  Reynolds at 23.  Plaintiff's contrary model would leave insurers vulnerable to not being able to "generate the necessary margins to allow it to stay in business," a factor that would impair the company's ability to pay benefits at a later time.  *Id.* at 24; *accord* Hendren ¶¶ 24, 34.

Plaintiff's interpretation would also run afoul of regulatory expectations. As explained by Ms. Hudson, an insurer's failure to consider "operational expenses, reserves, or other necessary factors in the development of its cost of insurance rate structure" would be "highly problematic" to state insurance regulators, and would not fulfill established regulatory expectations relating to an insurer's solvency and a product's financial viability. Hudson ¶¶ 94, 97–102. State regulators expect and require insurers, in setting their underlying cost of insurance rates, to follow sound actuarial principles and take into account "operational expenses, reserves, or other necessary factors in the development of its cost of insurance rate structure." Hudson ¶ 94; *accord* Hendren ¶¶ 8–10. These factors include not only information about the life expectancies of different categories of policyholders—sometimes called "mortality" factors—but also information concerning the company's revenue needs, to ensure that the company can pay its operating expenses, pay benefits when they come due, comply with regulatory reserve and surplus requirements, and similar considerations. Hendren ¶ 13; Reynolds at 29–30. In fact, as Mr. Reynolds confirms, applying Plaintiff's asserted "mortality-only" approach to developing State Farm's cost of insurance rates, absent significant changes elsewhere that Plaintiff's expert does not make, would produce a product that would fail California's "minimum profitability test," under which insurers must show that their products generate enough revenue to pay off the promised benefits in multiple scenarios. Reynolds at 27–28; *see also* Hendren ¶¶ 13, 22–34; Hudson ¶ 20. Allowing Plaintiff to impose her unworkable model retroactively on an insurance product that was offered under the supervision of state regulators, as the Policy was here—would undermine the complex regulatory and approval system established by state insurance regulators. Hudson ¶¶ 103–110; Hendren ¶¶ 14, 24, 34.

**4.    Even If The Cost of Insurance Provision Could be Read to Refer to State Farm's Process of Developing its Underlying Rate Tables, It Cannot Reasonably Be Read to Limit Permissible Factors to Age, Sex, and Rate Class**

Put simply, in light of the plain text and the overwhelming extrinsic evidence, there is only one reasonable interpretation of the Policy, and that is State Farm's. That interpretation not only comports with State Farm's reasonable expectations of how customers would understand the at-issue language, but is consistent with industry practice and the applicable regulatory framework. But even if the cost of insurance rate provision were misconstrued to refer to State Farm's underlying actuarial process for developing its rate structure, Plaintiff's proposed reading of the phrase "based on the Insured's age on the policy anniversary,

sex, and applicable rate class" to require State Farm to set its underlying rates by reference only to those factors would be unreasonable and unworkable, and would contravene settled industry standards and regulatory expectations.

As an initial matter, misreading the cost of insurance clause to preclude State Farm from developing its underlying rates with reference to such elements as expenses, capital reserve requirements, taxes, profit, and investment earnings, would lead to the same result of contravening settled industry practice and regulatory expectations as is described above, *supra* 23–26. Even more fundamentally, there is no logical way to calculate a rate, much less an entire rate structure, by exclusive reference to "age on the policy anniversary, sex, and applicable rate class." Other inputs would necessarily be required, for the simple reason that these factors do not themselves translate into dollars and the clause itself provides no methodology for doing so. Notably, as explained above, even Mr. Witt does not use Plaintiff's reading of the text, because his model does not calculate each Insured's cost of insurance rate based only on the age, sex, and rate class of insureds, either individually or as a group. Rather, he jumps from the policy language to a State Farm mortality table that includes other inputs (*i.e.*, *not* just age, sex, and "underwriting class") and he also adds in a new element, "duration," or how long a policyholder has held the Policy). And he does *not* include critical and undisputed factors that drive an Insured's rate class or "underwriting class," including tobacco use. Hendren ¶¶ 26, 28–29, 33–34; Stiroh ¶¶ 45–46. Plaintiff's position that age, sex, and rate class were the *only* permissible inputs when State Farm developed its rate tables not only is self-contradictory but would lead directly to the "[un]lawful, [in]operative" and "[in]definite" result that this Court must avoid. *Quantification Settlement Agmt Cases*, 201 Cal. App. 4th at 798. The Seventh Circuit recognized this exact problem, noting that it is "impossible" to generate a numerical cost of insurance rate by exclusive reference to the factors of age, sex, and rate class. *Norem*, 737 F.3d at 1152.

Although some courts have read the words "based on," as used in other cost of insurance provisions, to mean "exclusively based on," these cases addressed different policy language that expressly referenced the term "mortality factors." Unlike the phrase "the Insured's age on the policy anniversary, sex, and applicable rate class," which naturally refers to an individual Insured's characteristics, the term "mortality factors" can be read as applying more broadly to groups of insureds. For example, in *Yue v. Conseco Life Ins. Co.*, the policy stated that the rates would be "based on [the company's] expectation as to future

mortality experience." 2011 WL 210943, at *8 (C.D. Cal. Jan. 19, 2011).  The court was not considering a provision "with a list of factors for the insurer's consideration." *Norem*, 737 F.3d at 1154; *see also Rosenbaum v. Phil. Life Ins. Co.*, 1994 WL 17118392, at *2–3 (C.D. Cal. Mar. 1, 1994) (monthly cost of insurance rates were based on "expectations as to future mortality experience" and changes "will apply uniformly to all members of the same sex and class").  Likewise, in *Fleisher v. Phoenix Life Ins. Co.*, the policy stated that its cost of insurance rates would be based on "future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions." 18 F. Supp. 3d 456, 470 (S.D.N.Y. 2014).  Unlike the Policy here, this list included the broad term "future mortality," and also referenced factors internal to the insurer that could only be applied on a group basis, such as the "tax assumptions" the company would apply in setting its rates.

Many of these cases also addressed the separate and distinct issue of rate *increases* for cost of insurance rates—a process that, like determining a company's underlying cost of insurance rate tables, applies to group rate-setting and not an individual Insured's rate.  For example, in *Jeanes v. Allied Life Ins. Co.*, where the policy used the term "expectations as to future mortality experience," the court considered whether the company could consider other factors to increase its rates despite improving expectations with regard to mortality.  168 F. Supp. 2d 958, 973–74 (S.D. Iowa 2001) *aff'd in part, rev'd in part by* 300 F.3d 938 (8th Cir. 2002); *see also Rosenbaum*, 1994 WL 17118392, at *3.  But the factors that an insurer considers when increasing its rates is not the issue here, and that process in any event is addressed by a separate provision in the policy that, as discussed above, expressly refers to "expected mortality" as a factor for rate increases.  *Accord Norem*, 737 F.3d at 1154 (distinguishing *Jeanes* on the ground that the at-issue clause there relating to rate increases expressly referred to "mortality experience").

Finally, even if, despite all these issues, Plaintiff's reading of the Policy to require State Farm to set its underlying cost of insurance rates solely by reference to the factors of age, sex, and rate class could be deemed "reasonable," that conclusion still would not support summary judgment here.  Plaintiff relies on the *Vogt* court's order granting summary judgment—a ruling that State Farm submits was incorrectly decided, for the reasons discussed above.  But in any event, the *Vogt* ruling was premised on very different rules governing contract interpretation in Missouri, which allow extrinsic evidence only upon a finding of ambiguity.  *Exec. Bd. of Mo. Baptist Conv. v. Windermere Baptist Conf. Ctr.*, 280 S.W.3d 678, 696 (Mo.

Ct. App. 2009).  This Missouri rule thus allowed the *Vogt* court to look at "the language of the provision alone" to determine that the phrase "'based on' is at least ambiguous" to a person of ordinary intelligence. *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 764 (8th Cir. 2020).  From there—considering no external evidence as to whether the provision at issue is capable of two reasonable constructions—the Court reasoned that the phrase was "at least ambiguous and thus must be construed against State Farm."  *Id.*; *see also Fleisher*, 18 F. Supp. 3d at 471 (under dictionary definitions it would be "reasonable" for an insured to interpret the phrase "based on" as exhaustive and adopting the interpretation advanced by the insured under contra proferentem).  As shown above, California would not allow this result.  Indeed, at least one California appellate court has held that, where a contract required a result "based on" a historically determined amount, extrinsic evidence was needed to decide whether the parties meant these words to mean "equal to" or an "estimate" of.  *Horsemen's Benev. & Prot. Assn. v. Valley Racing Assn.*, 4 Cal. App. 4th 1538, 1557–62 (1992); *see also Dean v. United of Omaha Life Ins. Co.*, 2007 WL 7079558, at *6 (C.D. Cal. Aug. 27, 2007) (finding ambiguity where party presented "no [relevant] extrinsic evidence" to support its policy interpretation).  At a minimum, given the extensive extrinsic evidence submitted by State Farm, the same rule precludes summary judgment in favor of Plaintiff or the class here.

### 5.   This Court Did Not Decide the Contract Issues "As a Matter of Law" in Favor of the Class on State Farm's Summary Judgment Motion

Plaintiff contends that this Court, in its prior ruling, held "as a matter of law" that the at-issue Policy language must be read Plaintiffs' way, meaning as requiring that State Farm develop its underlying rate tables solely by reference to mortality factors.  Mot. 7.  Plaintiff is wrong that this Court's prior ruling compels summary judgment in her favor or that of the class.

As an initial matter, Plaintiff fails to note that the Court's prior ruling was on State Farm's motion directed to Plaintiff's *individual* claim, as no class had yet been certified, so obviously the Court's ruling did not extend to the class.  Even more fundamentally, Plaintiff is wrong as to the effect of this Court's ruling.  When a Court denies summary judgment for one party, that does not mean that it also rules for the other party, such that the latter party has satisfied its burden and should itself be granted summary judgment.  Wright et al., *supra*, § 2720; *Fred Segal*, 821 F. App'x at 786 (reversing summary judgment where "district court erroneously believed that" the denial of the nonmovant's motion "requir[ed] it to grant" movant's

1    motion).  And a court's denial of a summary judgment motion is "never law of the case," given the parties'

2    entitlement to continue to develop the facts.  *Peralta*, 744 F.3d at 1088.  State Farm's prior motion focused

3    on a narrow issue—namely, whether under the Seventh Circuit's decisions in *Norem* and *Thao*, the phrase

4    "based on" is "non-exclusive" as a matter of law.  Dkt. 63 at 12–18.  In denying that motion, this Court

5    concluded that it could not find the plain meaning of the phrase "based on" to be *unambiguously*

6    nonexclusive, and it did not reach the other issues State Farm raised.  Dkt. 77.

7            Plaintiff's suggestion that this Court must deem its prior ruling to be law of the case on ambiguity

8    and contract interpretation is an invitation to error, as doing so would violate clear summary judgment

9    protocol, *see Peralta*, 744 F.3d at 1088, and binding California precedent governing extrinsic evidence.

10   State Farm has submitted extensive and highly relevant evidence showing how it reasonably believed a

11   policyholder would understand the provision, including testimony from fact declarants and experts whose

12   testimony was not before the Court previously.   Under California law, the Court must consider that

13   evidence before reaching any final conclusion as to whether the Policy is ambiguous, much less resolving

14   any ambiguities in favor of Plaintiff or the class.  *Minkler*, 49 Cal. 4th at 321.  And, as noted, State Farm

15   directed its prior motion to Plaintiff only, not the entire class.   In this context, State Farm's extrinsic

16   evidence relating to State Farm's general sales and training practices are crucial to determining how the

17   class would have understood the at-issue policy language.  Indeed, allowing Plaintiff to turn this Court's

18   prior decision—even if it had been a ruling "as a matter of law" for Plaintiff—into a classwide ruling

19   would violate one-way intervention rule.  *See Schwarzschild v. Tse*, 69 F.3d 293, 295–96 (9th Cir. 1995).

20   **B.**     **The Class Is Not Entitled to Summary Judgment on the Conversion Claim**

21          Plaintiff also seeks classwide summary judgment on conversion, asserting that the Court's prior

22   summary judgment ruling "establishes as a matter of law that State Farm has been diverting money from

23   policy owners' Account Values without authorization or consent."  Mot. 2.  She again overreaches.  The

24   Court's ruling did not resolve this issue "as a matter of law" because the question whether the cost of

25   insurance deductions were allowed by the contract "is precisely the dispute."  Dkt. 77 at 7.  Nor did the

26   Court address "the first element of conversion," that is, whether the accumulated value that is a feature of

27   a Universal Life policy "is a 'specific thing' … to which plaintiff has a right of ownership or possession."

28   *Brighton Trs. v. Transamerica Life Ins. Co.*, 2019 WL 5784925, at *9–10 (C.D. Cal. Nov. 4, 2019)

1   (alterations in original) (citing *Voris v. Lampert*, 7 Cal. 5th 1141, 1151 (2019)).   Plaintiff has not

2   established entitlement to summary judgment on either issue.

3         Plaintiff also has not established a "definite, identifiable sum of money" wrongfully taken.   *See PCO*

4   *Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 395 (2007).

5   Indeed, her motion leaves open "the amount of money State Farm converted," referring to a "forthcoming"

6   expert report for the amount of "damage," Mot. 2 n.1, 9, but the only report disclosed was the Witt report,

7   which identifies no specific sum or chattel taken from Plaintiff or any class member.   *See* Stiroh ¶¶ 16, 31.

8         This failure is fatal to Plaintiff's motion.   For a claim for conversion of money, the defendant must

9   have "interfere[d] with the plaintiff's [1] possessory interest in a [2] specific, identifiable sum."   *Kim v.*

10   *Westmoore Part., Inc.*, 201 Cal. App. 4th 267, 284 (2011); *see PCO*, 150 Cal. App. 4th at 395 (for money

11   to be the subject of conversion, there must be "a specific, identifiable sum").   Because "[t]he gravamen of

12   [conversion] is the defendant's hostile act of dominion or control over a specific chattel to which the plaintiff

13   has the right of immediate possession," money qualifies as specific property for conversion claims only

14   when it is "'identified as a specific thing.'"   *PCO*, 150 Cal. App. 4th at 395.   Otherwise, as here, the proper

15   claim is for breach of contract.   *Ross v. U.S. Nat. Ass'n*, 524 F. Supp. 2d 1014, 1024 (N.D. Cal. 2008).

16         Nor can Plaintiff show "harm above and beyond a broken contractual promise."   *Stop Loss Ins.*

17   *Brokers, Inc. v. Brown & Toland Med. Grp.*, 143 Cal. App. 4th 1036, 1057 (2006) (internal citations and

18   quotation marks omitted).   "A person may not ordinarily recover in tort for the breach of duties that merely

19   restate contractual obligations," *id.* at 1041, a rule that "prevents the law of contract and the law of tort from

20   dissolving one into the other."   *Singh v. Amguard Ins. Co.*, 2016 WL 7469641, at *2 (C.D. Cal. Apr. 1,

21   2016); *see also Lincoln Gen. Ins. Co. v. Access Claims Adm'rs, Inc.*, 2007 WL 2492436, at *8 (E.D. Cal.

22   Aug. 30, 2007).   Tort damages apply only where the defendant violated a duty *independent* of the contract.

23   *Erlich v. Menezes*, 21 Cal. 4th 543, 551 (1999); *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 2016 WL

24   829210, at *7 (E.D. Cal. Mar. 3, 2016).   Because Plaintiff's conversion allegations are identical to those

25   supporting the contract claim and establish no independent tort, the conversion claim fails.

26   **C.**      **Plaintiff Has Not Met Her Summary Judgment Burden on the Statute of Limitations**

27         Under California law, a claim accrues "when the cause of action is complete with all its elements."

28   *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005) (internal quotation omitted).   California's

limitations period on a claim for a breach of written contract is four years.  Cal. Code Civ. Proc. § 337(1); *Krieger v. Nick Alexander Imports, Inc.*, 234 Cal. App. 3d 205, 220–21 (1991).

Where applicable, the "discovery rule" can be used to delay accrual for some types of claims until the plaintiff discovers, or reasonably could have discovered, the facts underlying the claim.  In *April Ent., Inc. v. KTTV*, 147 Cal. App. 3d 805, 831 (1983), the court extended this rule to delay accrual for a contract claim where the injury, or the act causing the injury (in that case, the secret erasure of tapes), was "difficult for the plaintiff to detect" and the defendant "has reason to believe the plaintiff remained ignorant he had been wronged."  This extension to contract claims is quite limited, as this Court has recognized in at least one prior case.  *See*, *e.g.*, *Perez-Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1134–36 (N.D. Cal. 2006) (Breyer, J.) (reading *April* to mean that the discovery rule can be invoked only where the breach is a "secretive" one, and does not apply merely because "plaintiffs simply did not know" about a breach and defendants "did nothing to hide, mask, or keep secret" how the policy worked).  Absent an extension of accrual, "[a] cause of action for breach of contract accrues at the time of the breach of contract, and the statute of limitations begins to run at that time regardless of whether any damage is apparent or whether the injured party is aware of his right to sue."  *Id.* at 1134.

In addition to these rules for contract cases, a plaintiff whose complaint shows on its face that a claim would be barred absent the discovery rule must "specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence." *Fox*, 35 Cal. 4th at 808 (emphasis in original); *Plumlee v. Pfizer, Inc.*, 664 F. App'x 651, 653 (9th Cir. 2016).   In other words, the party seeking the benefit of the discovery rule "ha[s] the burden of demonstrating their entitlement to delayed accrual of their causes of action."  *NBCUniversal Media, LLC v. Super. Ct.*, 225 Cal. App. 4th 1222, 1232 (2014).

Here, the Complaint reveals that Plaintiff purchased her policy and State Farm began deducting fees in April 1994, over 24 years before she filed this action, so Plaintiff's cause of action, absent the discovery rule, would have been barred over two decades ago—thus triggering her burden to make the showing required by *April* and *Fox*.  Yet Plaintiff has not even tried to meet this burden, for herself or for the class.  Instead, she again seeks a shortcut, arguing that this Court *already held* that neither Plaintiff nor any other member of the class was on notice of his or her claims.  Mot. 9–10.

Gibson, Dunn & Crutcher LLP

32

1    This is incorrect.  This Court never made any factual determination as to whether and when any of

2    the class members—including Plaintiff—were on notice of their claims.  Even apart from the problem

3    that, as discussed above, the Court's prior ruling was on *State Farm*'s motion and thus obviously did not

4    grant summary judgment for Plaintiff, the Court's ruling did not resolve such fact issues as to then-*absent*,

5    putative class members, as the Court did not grant class certification until months later.  Absent putative

6    class members are not parties to an action until a class is certified.  *Smith v. Bayer Corp.*, 564 U.S. 299,

7    313 (2011); *Molock v. Whole Foods, Inc.*, 952 F.3d 293, 298 (D.C. Cir. 2020).  And due process requires

8    that a defendant be "afforded an opportunity to be heard," *Spector v. Super. Ct.*, 55 Cal. 2d 839, 843–44

9    (1961), and "to present every available defense," *Lindsey v. Normet*, 405 U.S. 56, 66 (1972); *Duran v.*

10   *U.S. Bank Nat'l Ass'n*, 59 Cal. 4th 1, 35 (2014); *Hendershot v. Ready to Roll Transp., Inc.*, 228 Cal. App.

11   4th 1213, 1225–26 (2014).  So even if Plaintiff had moved for summary judgment on State Farm's

12   limitations defense, and she did not, the Court *could not have* granted such a motion on a classwide basis.

13   Nor could Plaintiff make a classwide summary judgment showing on this point.  It is undisputed

14   that State Farm's annual notices provided detailed summaries of cost of insurance charges and advised

15   policyholders to "consider requesting more detailed information about your Policy to understand how it

16   may perform in the future."  *See*, *e.g.*, Dkt. 63-11 at 5.  The face-to-face agency process gave customers

17   extensive opportunities to ask questions about how the Policy functioned and how any charges would be

18   determined, both before and after Policy issuance.  Dahlen  ¶ 6; Lopez  ¶¶ 10–11.  State Farm agents

19   described the cost of insurance rate and charges, and explained that one function of the cost of insurance

20   charge, like regular monthly premiums in other types of policies, is to address the company's need to stay

21   in business, recover expenses, and remain financially sound so that it is still there years later to pay the

22   death benefits its policies promise to its insureds.  Dahlen  ¶¶ 14, 19.  Any person who wanted to learn

23   more about how the "age on the policy anniversary, sex, and applicable rate class" language worked in

24   their case could ask the State Farm agent or representative.  *Id.*  So many policyholders knew when they

25   bought their policies, or learned later, that State Farm uses the revenue generated by the cost of insurance

26   to cover expenses and other non-mortality factors and that the cost of insurance rate assigned to them was

27   taken from State Farm's rate tables based on their age, sex and rate class.  Dahlen ¶ 20; Lopez ¶ 11.

28   Plaintiff presents no contrary evidence, and certainly issues about each class member's subjective actual

1   or constructive knowledge based on conversations, levels of business sophistication, and inquiries cannot

2   be decided on a classwide basis, much less without evidence.  *See Wal-Mart Stores, Inc. v. Dukes*, 564

3   U.S. 338, 367 (2011) (Rule 23 cannot  be interpreted "to abridge a defendant's right "to litigate its …

4   defenses to individual claims").

5        Nor were these individualized questions somehow resolved by the Missouri federal court's ruling

6   on that issue in *Vogt*.  State Farm submits that the Court's ruling there was incorrect for these same reasons,

7   but in any event it turned on facts relating to different plaintiffs and different rules of Missouri law.  *See*

8   *Vogt*, 963 F.3d at 765.  It did not apply California's specific burden shifting rules that apply when the

9   complaint suggests a time-barred claim.  *Fox*, 35 Cal. 4th at 808.

10        Plaintiff's argument that class members had "no duty" to investigate (Mot. 10) is incorrect in the

11   context of the discovery rule.  Plaintiff's only case, *Baker v. Beech Aircraft Corp.*, 39 Cal. App. 3d 315

12   (1974), turned on allegations of *fraudulent concealment* of a design defect in a small aircraft—something

13   ordinary consumers could not have discovered in the ordinary course.  *Id.* at 321–22.  The court made

14   clear that "[m]ere ignorance, not induced by fraud of the existence of facts constituting a cause of action

15   does not prevent the running of the statute of limitations." *Id.* at 321.  Because Plaintiff and class members

16   had "the opportunity to obtain knowledge from sources open to [their] investigation," they are "charged

17   with presumptive knowledge of an injury," and their claims are barred.  *Fox*, 35 Cal. 4th at 807–08.

18        Finally, in California "it is well established that a party who signs a document is *presumed* to have

19   read it and to understand its contents."  *Toma v. Bankers Life & Cas. Co.*, 2019 WL 4229754, at *9 (S.D.

20   Cal. Feb. 25, 2019) (quoting *Baker v. Italian Maple Hold., LLC*, 13 Cal. App. 5th 1152, 1162–63 & n.6

21   (2017)); *accord Traynor v. Lexington Ins. Co.*, 2009 WL 10675394, at *2 (C.D. Cal. June 8, 2009), *aff'd*

22   420 F. App'x 674 (9th Cir. 2011).  Plaintiff and class members have a "duty" to read their policy documents,

23   *Traynor*, 2009 WL 10675394 at *2, and if they had, they would have understood how the Policy worked or

24   could have inquired about any charges.  At the very least, this is a disputed question that cannot be decided

25   *against* State Farm when Plaintiff has offered no evidence to meet her (or the class's) burden.

**D.    Plaintiff Cannot Use Offensive, Non-Mutual Collateral Estoppel to Bar State Farm From Presenting Evidence On Critical Factual Points**

26

27        Plaintiff next tries to bind State Farm through the doctrine of offensive, non-mutual collateral

28   estoppel to certain erroneous factual conclusions made by Plaintiff's expert, Mr. Witt, in a report he

presented to the jury in *Vogt.*  This attempted shortcut also fails.  Offensive collateral estoppel is universally disfavored by courts, including in Missouri, as it poses serious procedural and fairness problems to defendants, undermines judicial efficiency by incentivizing wait-and-see gamesmanship, and deprives defendants of critical due process, Rule 23, and Seventh Amendment protections.

Because Vogt was decided in Missouri federal court, the preclusive effect of that judgment turns on Missouri's prior adjudication rules.  *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001); *see Oates v. Safeco Ins. Co. of Am.*, 583 S.W.2d 713, 719 (Mo. 1979).  In Missouri, courts applying collateral estoppel defensively—that is, where the defendant invokes the doctrine against a plaintiff who lost in a prior action—consider whether: (1) the issue decided in the prior case was identical with the issue in the present case; (2) the prior case resulted in a judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior case; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit.  *Coop. Home Care, Inc. v. City of St. Louis*, 514 S.W.3d 571, 581 (Mo. 2017).

Where a party tries to use collateral estoppel *offensively*—that is, where a plaintiff invokes it to capitalize on another plaintiff's victory against the same defendant—Missouri courts apply the doctrine more cautiously, using the "narrow use of offensive collateral estoppel as laid down in [*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979)]."  *Green v. Fred Weber, Inc.*, 254 S.W.3d 874, 884 (Mo. 2008).  In *Parklane*, the Court explained that "offensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does."  439 U.S. at 329.  Whereas defensive collateral estoppel incentivizes a plaintiff to join all potential defendants in the first action by precluding the plaintiff from relitigating issues by simply switching adversaries, *id.* at 329–30, offensive collateral estoppel has the opposite effect:  "Since a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment."  *Id.* at 330.  This increases litigation because potential plaintiffs "have everything to gain and nothing to lose by not intervening in the first action."  *Id.*  The doctrine also poses serious fairness issues "where a plaintiff could easily have joined in the earlier action  … [and when] the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel."  *Id.* at 331.

Likewise, offensive collateral estoppel is "disfavored" in Missouri and "will not be applied when doing so would be inequitable." *Coop. Home Care*, 514 S.W.3d at 581; *accord Jack Faucett Assocs., Inc. v. Am. Tel. & Tel. Co.*, 744 F.2d 118, 124 (D.C. Cir. 1984) (offensive collateral estoppel is "detailed, difficult, and potentially dangerous"). The Missouri Supreme Court has adopted the narrow reading of offensive collateral estoppel outlined in *Parklane*, *see Green*, 254 S.W.3d at 884; *James v. Paul,* 49 S.W.3d 678, 685 n.5 (Mo. 2001), and Missouri courts have applied it in only a few cases, none of which involved facts like those here. *Id.* (noting that, as of 2001, only two Missouri cases had allowed offensive collateral estoppel— an attorney disciplinary case involving successive actions arising from the same conduct, and a civil forfeiture proceeding involving a prior guilty plea for marijuana possession). The criteria for collateral estoppel are not met here, and the *Parklane* considerations weigh heavily against its application.

### 1.   The damages determinations in *Vogt* are *not* identical to issues presented here

Application of offensive collateral estoppel is improper here. Plaintiff has not shown that the Missouri Supreme Court applies the doctrine to a jury's **unstated** calculus for awarding damages. Under Missouri law, a defendant has a right to a jury determination of damages. *See Watts v. Lester E. Cox Med. Ctrs.*, 376 S.W.3d 633, 643 (Mo. 2012). But a jury's choice on the measure of damages and assumptions supporting it are not findings of fact, and Plaintiff identifies no authority for the idea that a jury's methodology for awarding damages—even if it *had* been stated—binds a party from one case to another through offensive, non-mutual collateral estoppel. Nor would that make sense, because the use of one damages model by one jury does not make the facts assumed by that model dispositive as to another set of plaintiffs in a different state pursuing claims under a different state's laws. Indeed, every case Plaintiff cites involved a concrete fact determination that was *necessarily* determined as an element of liability— not an *unstated* methodology for calculating damages.[5]

Further, the *Vogt* jury did not "unambiguously, necessarily and implicitly" adopt any specific factual finding or assumption in its damages award in any event. Mot. 11–12. This standard is not met where a prior jury's verdict is merely consistent with or even "intimately related to" certain factual

---

[5]  *See, e.g.*, *Carr v. Holt*, 134 S.W.3d 647, 650 (Mo. Ct. App. 2004) (civil defendant could not dispute intent after prior assault conviction for which "intent [was] a required element," as the issue was "necessarily determined" in the criminal case); *James*, 49 S.W.3d at 683 (defendant could not deny acting "purposely or knowingly" where an element of his prior conviction was "acting with the purpose to kill" or "knowing" that the conduct was "practically certain to result in serious physical injury"); *accord In re Caranchini*, 956 S.W.2d 910, 913 (Mo. 1997).

Gibson, Dunn &
Crutcher LLP

assumptions where the jury "did not necessarily decide" those issues. *Continental Cas. Co. v. Tierney*, 1991 WL 207398, at *2 (W.D. Mo. July 2, 1991).  Plaintiff's expert presented the jury with *four* methodologies for calculating damages, each of which included factual assumptions not presented for decision by the jury.  The jury was told to decide whether the *Vogt* plaintiffs were damaged by State Farm's alleged breach, and, if so, to award "such sum" as it believed would "fairly and justly compensate" the class.  *Vogt* Dkt. 356, Instr. 15–17.  The jury was *not* asked to decide whether State Farm's "mortality-only COI rate is anything other than its unloaded pricing mortality rate," whether State Farm considered tobacco use as part of establishing its rate tables, or what other methodologies or assumptions State Farm used to develop those tables, and the jury's one-page general verdict form reveals no resolution of these issues.  *Id.* Dkt. 358.  Nothing indicates that the jury "unambiguously" and "necessarily" adopted specific pricing mortality assumptions, or even whether it agreed with one methodology and *all* of its assumptions or used a combination of assumptions to decide what would "fairly and justly" compensate the class.  Although Plaintiff wants this Court to *assume* that the jury made specific findings, that is not the rule for collateral estoppel, much less offensive collateral estoppel.  *Continental Cas.*, 1991 WL 207398, at *2.

Plaintiff's motion fails for the additional reason that she is pursuing claims under California law—not Missouri law as in *Vogt*.  As noted, California law on contract interpretation, defenses, and damages materially differs from Missouri law, so the issues here are not "identical to" *Vogt*.  *Coop. Home*, 514 S.W.3d at 581.  Crucially, Missouri law and California law apply the opposite rule as to whether extrinsic evidence can be used to establish an ambiguity in the contract, *supra* 18–20, a critical point given that Plaintiff now asks this Court to rule on the contractual claim *as a matter of law* without considering the extrinsic evidence submitted by State Farm.  Courts appropriately reject offensive collateral estoppel where the factfinder in a later action must apply the laws of a different state.  *See*, *e.g.*, *Boomer v. AT&T Corp.*, 309 F.3d 404, 422 n.10 (7th Cir. 2002); *Guild Trust v. Union Pac. Land Res. Corp.*, 682 F.2d 208, 211 (10th Cir. 1982).  The result should be no different here.

Plaintiff ignores other differences that make any damage methodology in *Vogt* inapplicable and unreliable here.  Unlike the plaintiff in *Vogt*, the Insured here was in a non-tobacco rate class while her Policy was in force.  Mr. Witt's damages methodology in *Vogt* did not account for the effect of an Insured who used tobacco—underscoring why the highly individualized nature of a damages award is not a proper

Gibson, Dunn & Crutcher LLP

subject for offensive collateral estoppel. State Farm has a due process right to present argument and evidence to show that Mr. Witt's failure to account for tobacco use among class members is fatal to the reasonableness and reliability of his model. See *Comcast Corp. v. Behrend*, 569 U.S. 27, 35–38 (2013).

Finally, the factual assumption to which Plaintiff seeks to bind State Farm—specifically, that State Farm, in setting its rates for the Policy, differentiated among insureds based on how long they held their Policies and *did not* differentiate based on whether they used tobacco—are flatly wrong. *See* Hendren ¶¶ 26–29, 33–34. In fact, the undisputed evidence shows that (1) tobacco use was a critical differentiator in State Farm's rate structure for the Policy, forming a major division in rate classes applicable to all insureds, and (2) State Farm's rates do *not* differentiate based on how long a customer held the Policy. *Id.* ¶¶ 26, 28–29, 33; Prestegaard ¶ 3  Again, Plaintiff's sole basis for her contrary assertion is the jury's general verdict in *Vogt* after being presented with a model where Mr. Witt made these incorrect assumptions. Mot. 12–13. But even if offensive collateral estoppel could apply to such findings, the jury did not make any. And no Missouri case suggests that State Farm can be estopped from presenting a true fact simply because an expert made incorrect factual assumptions when presenting the same damages model in a prior case.[6] Such a use of the doctrine to codify an objectively false contention would run afoul of the fairness limitation on the doctrine required by *Parklane* and Missouri law. *See infra* 38–39.[7]

### 2.  *Parklane*'s fairness factors foreclose application of the doctrine here

Remarkably, Plaintiff has not even addressed the most critical factor under *Parklane*: whether "application of offensive estoppel would be unfair to the defendant." 439 U.S. at 330–31; *see also James*, 49 S.W.3d at 685 n.5. That is not surprising because Plaintiff fails the touchstone admonition that a "trial judge should not allow the use of offensive collateral estoppel" where "a plaintiff could easily have joined in the earlier action." *Parklane*, 439 U.S. at 331. Plaintiff's tactics present precisely the problem

---

[6]  Plaintiff's expert pointed to testimony that he read as meaning that State Farm differentiated based on how long an Insured held the Policy and did not differentiate based on tobacco use. Vogt Dkt. 403 at 12-13. But the record is clear that these assumptions are incorrect, and the mortality table to which the deposition responses referred did not address State Farm's actual cost of insurance rates. Hendren ¶¶ 16, 33. And the jury made no "finding" on this issue just by selecting one of the plaintiff's damages models.

[7]  Plaintiff asserts in a footnote that "Vogt precludes State Farm from further litigating whether it loaded its COI rates with factors unauthorized by the policy." Mot. 8 n.4. Plaintiff provides no argument or support for this point, which ignores the fact that California law differs from Missouri law, including when a court considers extrinsic evidence. Such differences preclude the use of collateral estoppel. *E.g.*, *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1302 (7th Cir. 1995).

foreshadowed in *Parklane*—that a plaintiff seeking to use offensive collateral estoppel "has every incentive to adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment." *Id.* at 330.   The plaintiff in *Vogt*, represented by Plaintiff's same counsel, initially pled a *nationwide* class action and sought nationwide discovery, *Vogt* Dkt. 1 ¶¶ 45–47, despite the obvious problems with certifying such a class given significant differences among the applicable state's laws.   But on the eve of trial, counsel changed tack and sought certification of a Missouri-only class.  Vogt Dkt. 145, 161.  After receiving a plaintiff's verdict applying Missouri law to a much smaller Missouri class, Plaintiff's counsel now wants to expand liability through class proceedings in other states.  But if Plaintiff believes that state laws do not differ in any material way such that there can be identity of issues with *Vogt*—as collateral estoppel requires—she and other class members "could easily have joined in the earlier [*Vogt*] action" in a nationwide proceeding, as the case was original pled.  *Parklane*, 439 U.S. at 331.  But instead, Plaintiff now seeks to pursue exponentially greater class damages in a state *seven times* more populous than Missouri—and her counsel have filed similar actions in other states, threatening to invoke offensive collateral estoppel there as well.  If such a tactic were allowed, counsel would surely try to march a single verdict, from a state comprising less than 2% of the U.S. population, around the entire country, seeking to bar State Farm from defending class actions in multiple other states.

That problem is compounded by Plaintiff's request for punitive damages—a remedy rejected in *Vogt, see* Dkt. 320.   That raises the disproportionate stakes even higher and triggers other safeguards precluding offensive collateral estoppel.  The Seventh Amendment requires a jury to decide the amount of a punitive damages award.  *See*, *e.g.*, *Feltner v. Columbia Pict. Tel., Inc.*, 523 U.S. 340, 352–54 (1998); *Morgan v. Woessner*, 997 F.2d 1244, 1258–59 (9th Cir. 1993); *Grisham v. Philip Morris, Inc.*, 670 F. Supp. 2d 1014, 1036 (C.D. Cal. 2009).  If this case goes to a jury, it would have to hear evidence on breach and damages before deciding whether and in what amount to award punitive damages.   That practical reality would eliminate any potential efficiency gained by applying offensive collateral estoppel now.  *See Setter v. A.H. Robins Co., Inc.*, 748 F.2d 1328, 1331 (8th Cir. 1984); *Grisham*, 670 F. Supp. 2d at 1036–37.

**E.      Summary Judgment Cannot be Granted on the Declaratory Judgment Claim**

Plaintiff's declaratory judgment claim entirely duplicates her breach of contract claim.  In fact, in

1   support of summary judgment on her declaratory relief claim, Plaintiff merely reincorporates her

2   contractual arguments "as set forth above." Mot. 9. Accordingly, the same contract interpretation issues

3   that preclude summary judgment on the contract claim make it inappropriate for the declaratory relief

4   claim as well. *Krajewski v. Am. Honda Fin. Corp.*, 557 F. Supp. 2d 596, 612 (E.D. Pa. 2008); *StreamCast*

5   *Networks, Inc. v. IBIS LLC*, 2006 WL 5720345, at *3–4 (C.D. Cal. May 2, 2006); *Custom LED, LLC v.*

6   *eBay, Inc.*, 2012 WL 1909333, at *–5 (N.D. Cal. May 24, 2012).

7   **F.     Summary Judgment is Inappropriate on State Farm's Setoff Defense**

8          Summary judgment also is inappropriate on what Plaintiff calls State Farm's "setoff defense,"

9   which she challenges on the ground that no specific provision of the Policy allows State Farm "to reduce

10  its liability" for allegedly "excessive COI charges in those rare instances where it charged less than it was

11  authorized to charge." Mot. 17. But whether State Farm has "liability for excessive COI charges" is a

12  legal question that turns upon disputed factual issues, as shown above, and Plaintiff's own model does not

13  even reflect a calculation based *only* on age, sex, and rate class—so it is itself a flawed "remedy" for State

14  Farm's purported breach. Stiroh ¶¶ 14, 43. In any event, there is no rule requiring State Farm to identify

15  a "provision in the policy" allowing a damages calculation that accurately reflects the purported damages,

16  or as relevant here, the *absence* of damages to many of its policyholders.

17         Contrary to Plaintiff's suggestion, the "cross-over" effect State Farm has shown—meaning the

18  point in Plaintiff's damages model where policyholders are actually *harmed* by the alternative rate

19  structure her expert advocates—does not occur because State Farm "sometimes" chooses not to apply the

20  mortality factors Plaintiff asserts it should apply. Mot. 17. Rather, it occurs because Plaintiff's model

21  makes a series of assumptions that do not reflect the Policy language or State Farm's actual methodology

22  and assumptions for developing its rates, and is instead a contrived device that would produce lower rates

23  for some class members through the time of judgment but then higher rates moving forward for those

24  whose policies remain in force. Stiroh ¶¶ 47–53. None of this gives Plaintiff or the class a right to

25  summary judgment on this defense, as disputed issues preclude any such result, and in any event the

26  application of this defense is an individualized inquiry that cannot be resolved on a classwide basis.

27                              **V.  CONCLUSION**

28         For the foregoing reasons, Plaintiff's motion for summary judgment should be denied.

Gibson, Dunn &
Crutcher LLP

1

2      DATED: January 8, 2021
                                          _____
3                                          Kristin A. Linsley (CBN 154148)

4                                          GIBSON, DUNN & CRUTCHER LLP
                                           klinsley@gibsondunn.com
5                                          555 Mission Street, Suite 3000
                                           San Francisco, CA 94105
                                           Telephone:    415.393.8395
6                                          Facsimile:    415.393.8471

7                                          Deborah L. Stein
                                           dstein@gibsondunn.com
8                                          333 South Grand Avenue
                                           Los Angeles, CA 90071
9                                          Telephone:    213.229.7164
                                           Facsimile:    213.229.6164
10

11                                         *Attorneys for Defendant State Farm Life
                                           Insurance Company*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on January XX, 2022, I electronically filed the foregoing with the Clerk

3

of the Court using the CM/ECF system, which will send notice of such filing to all registered users.

4

5

By:   _____

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT STATE FARM'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – CASE
NO. 3:18-CV-04954-CRB

1

**CERTIFICATE OF COMPLIANCE**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

[PROPOSED] ORDER EXTENDING TIME FOR DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT – CASE NO. 3:18-CV-04954-CRB