# EXHIBIT 1

1

2                   UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4

5    ELIZABETH A. BALLY,          )
     Individually and On Behalf )
6    Of All Others Similarly      )
     Situated,                    )
7                                 )
               Plaintiffs,        )
8                                 )
        vs.                       )   Case No. 3:18-CV-04954-CRB
9                                 )
     STATE FARM LIFE INSURANCE    )
10   COMPANY,                     )
                                  )
11              Defendant.        )
     _____)

12

13        REMOTE VIDEOTAPED DEPOSITION OF SCOTT WITT

14                  Milwaukee, Wisconsin

15               Friday, February 12, 2021

16

17

         REPORTED BY: Dayna Michelle Glaysher
18                    CSR No. 13079; RPR, CRR No. 28081

19

20

21

22

23

24

25

                                              Page 1

1       A.  Well, for instance, in the current case, when it

2   became apparent that Excel was no longer going to be

3   feasible based on the size of the data, Melvin Ott was

4   engaged to help with the SAS aspects of the model.

5       Q.  And who are they?                          10:22:29

6       A.  Melvin Ott is a -- has a background in computers

7   and programming, this sort of thing.  And he -- while at

8   one time I was well versed in SAS, that time has passed.

9   And I'm -- my familiarity is at a high level.  And he

10  was able to help implement at a granular level what I     10:22:52

11  wanted to be implemented.

12      Q.  And what did you want to be implemented?

13      A.  Well, I wanted to be able to have a model that

14  was not so unwieldy.  And State Farm's expert had

15  already started down the path of using SAS.  Which        10:23:17

16  undoubtedly we were headed down either a SAS or

17  something comparable path.

18          And that's what we opted to do was to work

19  with -- to work with what State Farm's expert had

20  started with.                                            10:23:38

21      Q.  And what -- what does Mr. Ott's like company do?

22      A.  I don't know.

23      Q.  How did you find him?

24      A.  Through counsel.

25      Q.  And what is his expertise?                        10:23:57

                                                    Page 19

```
 1      A.  The only expertise that I'm aware of is he was

 2   brilliant with SAS.  And that -- that was all that

 3   mattered.  He was able to speak the -- speak my language

 4   and able to implement the things that I wanted to have

 5   implemented.  And very responsive and savvy.              10:24:20

 6      Q.  So did you rely on his work?

 7      A.  That might -- I relied -- I relied on his

 8   expertise.  And then I -- the work product is my own.  I

 9   verified everything he did.  And had the means of being

10   able to double check it with a different -- I was able    10:24:49

11   to verify the SAS calculations and outputs with Excel

12   and satisfy myself that it was faithfully reproduced.

13          But I relied on his expertise in the SAS coding,

14   you know, replicating what -- what -- what we needed it

15   to be.  And in putting the output in a format that I      10:25:20

16   could copy that into Excel.

17      Q.  And did you -- did you personally retain Mr. Ott?

18      A.  I did -- I did not.  That -- he was retained by

19   counsel.

20      Q.  So he was doing coding for you?                    10:25:38

21      A.  He -- he did some SAS coding.  The bulk of the

22   coding was actually done by State Farm's expert.  And

23   then in the course of checking results, I identified

24   some anomalies.  And to address those he ended up making

25   some minor modifications to the code to address those     10:26:13
```

Page 20

1    I'm certain that's not comprehensive.

2      Q.  Did you -- did you say that you reviewed other

3    expert reports?

4      A.  I -- I did not specifically read those in the

5    days leading up to this deposition, but I did read them    10:40:04

6    previously.

7      Q.  Did you review any documents that you understood

8    to be from State Farm's files in preparation for your

9    deposition today?

10             MR. LYTLE:  Object to the form.            10:40:26

11             THE WITNESS:  Yeah, I think so.  You know,

12   I -- I looked at the actuarial memorandum I think from

13   New Jersey.  I would consider that to be from State

14   Farm's files.  I think there was a -- a letter from

15   Mr. Root pertaining to some of the data that I          10:41:00

16   familiarized myself with again.

17             Again, I'm sure there were other State Farm

18   produced documents that -- that I looked at.  But those

19   are the ones I can think of off the top of my head.

20   BY MS. STEIN:                                          10:41:18

21      Q.  When you were preparing your opinions in this

22   case, how did you -- strike that.

23         When you were preparing your opinions in this

24   case, you reviewed certain documents that were from

25   State Farm.                                            10:41:38

Veritext Legal Solutions
866 299-5127

1    Mutual was contemplating developing a new kind of

2    policy.  And I was part of a team that was pricing that

3    behind the scenes to figure out whether or not the

4    product can be viable.

5       Q.  And when you were at Northwestern Mutual and on    11:07:59

6    this pricing team, the mortality tables were one input

7    for calculating the price of insurance?

8              MR. LYTLE:  Object to the form.

9              THE WITNESS:  Could you rephrase or restate

10   the question, please.                                   11:08:29

11   BY MS. STEIN:

12      Q.  Sure.  So when you were involved in pricing life

13   insurance policies at Northwestern Mutual, there was

14   many factors that went into pricing; is that correct?

15      A.  Yes.                                              11:08:41

16      Q.  And the mortality tables were one factor?

17      A.  Yes.

18      Q.  And what were some other factors?

19      A.  Expenses, investments.  Indirectly you could say

20   persistency affected all three of those factors that I   11:09:13

21   just described.  Then there was another part of the team

22   that dealt with things like reserves and things more at

23   a corporate modeling level, like asset adequacy testing,

24   and if this dividend was paid what would the impact be

25   on surplus.                                             11:09:42

Page 43

1    experience at Northwestern Mutual and subsequent 15, 16

2    years of experience as a fee-only insurance advisor, and

3    employing, you know, actuarial techniques on almost a

4    daily basis.

5        Q.  And what skills does it include?                    12:11:39

6                MR. LYTLE:  Object to the form.

7                THE WITNESS:  Well, it would include the

8    skill set that actuaries have.  The ability to analyze

9    complex situations, analyze risks, perform calculations

10   as necessary.  You know, it's a -- it's a wide ranging      12:12:02

11   skill set.

12   BY MS. STEIN:

13       Q.  Any other skills?

14       A.  Well, I mean the ability to operate in the

15   insurance world and to marry the insurance concepts with    12:12:22

16   mathematical concepts, the ability to explain technical

17   concepts in non-technical language hopefully.  Those

18   are -- you know, those are skill sets that actuaries

19   have.

20       Q.  And which of those skills did you utilize in your   12:12:41

21   expert work in this case?

22       A.  Frankly, there wasn't a lot of actuarial

23   expertise or judgment I should say that was required.

24   I -- I would say that I needed expertise just to be able

25   to sift through the documents, recognize what was needed    12:13:03

Page 71

1    in order for me to calculate lost account value.

2         But for the most part -- for the most part it was

3    a relatively straightforward exercise applying

4    plaintiffs' theory, and using that theory to come up

5    with lost account value for each policyholder.          12:13:27

6       Q.  And so the skills that you utilized in your

7    calculation were computational?

8       A.  I think that's fair to say.

9       Q.  Okay.  So we talked about actuarial expertise and

10   the damages calculation issue.                          12:14:00

11        Any other things that you consider yourself an

12   expert in?

13      A.  I mean I have expertise in computer modeling.

14   That's tied in with computational and actuarial

15   expertise.  You know, those skills are intertwined.     12:14:23

16      Q.  Do you consider yourself an expert in SAS?

17      A.  I do not.  I used to be, but not now.

18      Q.  And you don't consider yourself an expert in

19   policy interpretation, do you, Mr. Witt?

20      A.  I do not.                                         12:14:44

21      Q.  Okay.  And you're not offering an opinion in this

22   case on policy interpretation?

23      A.  I am not.

24      Q.  Okay.  And you don't consider yourself an expert

25   in life insurance regulation, right?                    12:14:52

Page 72

```
 1   BY MS. STEIN:

 2      Q.  Why do you not know how to answer the question?

 3           MR. LYTLE:  Object to the form.

 4           THE WITNESS:  I developed a straightforward

 5   methodology that identified the lost account value at a    12:43:05

 6   particular point in time.  It was on point.  It was

 7   directly answering the question at hand.

 8   BY MS. STEIN:

 9      Q.  So your methodology was created solely for the

10   purpose of this litigation?                               12:43:26

11           MR. LYTLE:  Object to the form.

12           THE WITNESS:  Yeah.  I mean it's -- I guess

13   logic is the most important ingredient that I used.  And

14   that manifested itself in the methodology that was used

15   for this case.                                            12:43:55

16   BY MS. STEIN:

17      Q.  Has your methodology been tested?

18           MR. LYTLE:  Object to the form.

19           THE WITNESS:  Oh, well, it was tested

20   rigorously by opposition in the Vogt case in Missouri,    12:44:16

21   and I've tested it substantially.

22   BY MS. STEIN:

23      Q.  Has your methodology been subject to peer review

24   outside of litigation?

25      A.  No.                                                12:44:36
```

                                                              Page 88

```
 1      Q.  Did you run it to past any of your actuarial

 2   colleagues to see what they thought?

 3      A.  No.

 4      Q.  What controlling standards did you use in

 5   applying your methodology?                        12:44:54

 6              MR. LYTLE:  Object to the form.

 7              THE WITNESS:  I -- my work speaks for

 8   itself.  I -- I don't have any standards to point to.

 9   It's my work product is there, everything's been turned

10   over.  The other side can verify everything I've done.   12:45:11

11   BY MS. STEIN:

12      Q.  Did you rely on any literature in developing your

13   methodology?

14              MR. LYTLE:  Object to the form.

15              THE WITNESS:  It is -- it is a very           12:45:31

16   simple -- it's simultaneously simple and incredibly

17   complex.  But the complexity comes about from the data,

18   not from the methodology itself.  The methodology

19   identifies excess, cost of insurance rates or rates

20   where there is an excess cost of insurance above and     12:46:00

21   beyond the underlying pricing mortality.

22              Substitutes those rates back into the -- the

23   exact formula that is specified in the contractual

24   language.  I recalculate what the account value would've

25   been using transactions that actually occurred using     12:46:17
```

Page 89

```
 1    entirely State Farm's own data supplied by experts and

 2    the company.

 3              And compare that -- that re-calculated

 4    account value with the original account value.  And I

 5    look at the last -- basically the last transaction,          12:46:34

 6    whether it's at a particular date or on a terminated

 7    policy.  The -- you know, when the policy terminated.

 8    And at that point in time that represents the lost

 9    account value.  And that's it.

10    BY MS. STEIN:                                                 12:46:50

11       Q.  All right.  Well, let's walk through this step by

12    step so that we can make sure that we're on the page --

13    the same page.

14          So what was the -- the very first step in your

15    methodology where -- what was your starting point?          12:47:00

16       A.  Well, I think it was an investigation and a

17    recognition that indeed the cost of insurance rates in

18    many instances were higher than what State Farm

19    described as the pricing mortality table.

20       Q.  So you -- you say that you investigated and          12:47:31

21    determined that in many instances it was higher.

22          How did you determine that?

23          Did you -- I'm trying to break this down.  So

24    like you engaged in this process.  And you start at some

25    sort of mathematical exercise at some point.                12:47:49
```

Page 90

```
 1                MS. STEIN:  Thank you.

 2                THE WITNESS:  Yeah.

 3                MR. LYTLE:  If it -- if it helps you,

 4     Deborah, we are happy to take a quick break now.  And if

 5     that's something that you want to -- because you're on        01:04:37

 6     that line of questioning, we can take a quick break now

 7     and try to identify that for you, if that's helpful.

 8                MS. STEIN:  I will want to see it.  But I'm

 9     going to press on for now.  So I'm fine doing it on a

10     break.                                                         01:04:51

11     BY MS. STEIN:

12         Q.  So Mr. Witt, were you -- were you the one to

13     decide that these were the -- the numbers, the mortality

14     experience numbers were the numbers to use for building

15     your model?                                                    01:05:13

16                MR. LYTLE:  Object to the form.

17                THE WITNESS:  I'd say it was the -- the

18     counsel that developed the theory of what their damages

19     were.  But my use of this specific mortality table was

20     entirely based on State Farm's documents and testimony.       01:05:37

21     BY MS. STEIN:

22         Q.  And in making that determination did you exercise

23     your actuarial science judgment?

24         A.  I didn't have to.

25         Q.  Why not?                                               01:05:50
```

Page 102

1             MR. LYTLE:  Object to the form.  Asked and

2  answered.

3             THE WITNESS:  When State Farm repeatedly in

4  multiple forms and in writing, in depositions, in

5  provided materials indicates that the pricing mortality   01:35:59

6  table is blended across smokers, I didn't feel it was

7  appropriate to introduce facts that were not in evidence

8  and assume something other than what State Farm

9  repeatedly said that they did.

10  BY MS. STEIN:                             01:36:21

11    Q.  Well, there were facts in evidence, as you call

12  it, Mr. Witt, that State Farm's actual cost of insurance

13  rates were priced differently for tobacco users versus

14  non-tobacco users, right?

15             MR. LYTLE:  Object to the form.     01:36:33

16             THE WITNESS:  I agree that the COI rates

17  varied by tobacco status.

18  BY MS. STEIN:

19    Q.  Did you ever ask for information to find out how

20  State Farm arrived at tobacco versus non-tobacco rates?   01:36:48

21    A.  I had conversations with counsel about it.  That

22  was one of the things that I asked, you know, am I

23  missing something here.  Is there -- are there other

24  versions of mortality that I'm not seeing.  But --

25    Q.  So there are -- there was some factor that went   01:37:10

Veritext Legal Solutions
866 299-5127

1    into create -- State Farm's creation of tobacco versus

2    non-tobacco rates.

3        But you do not have that information; is that

4    correct?

5        MR. LYTLE:  Object to the form of the                01:37:24

6    question.  Misstates testimony.

7        THE WITNESS:  I saw an asset share pricing

8    program that also used the underlying mortality table

9    here that is tobacco blended.  And within that asset

10   share model, be different assumptions for smoker or for   01:37:45

11   tobacco and non-tobacco.  So it was evident to me that

12   the pricing exercise was done using the tobacco blended

13   mortality table.

14   BY MS. STEIN:

15      Q.  What are the tobacco versus non-tobacco           01:38:06

16   assumptions that you just referenced?

17      A.  They are with respect to the percentage of

18   business that fell in each category within the asset

19   share model.

20      Q.  If you had had additional information that showed   01:38:21

21   you how State Farm got to its cost of insurance rates

22   for tobacco users versus non-tobacco users, would that

23   have been something that you would have worked into your

24   model?

25      MR. LYTLE:  Object to the form.                       01:38:56

Page 123

1   were higher than the rates that were loaded with

2   additional expenses?

3           MR. LYTLE:  Object to the form.

4           THE WITNESS:  Well, strange things can

5   happen when contracts are breached.  And in a normal        02:16:38

6   situation maybe we wouldn't be talking about this.

7           But in a -- in a situation where the

8   assumption is that the contract has been breached, and

9   it -- in the process of calculating those damages if

10  I'm -- essentially have my hands tied to use mortality      02:16:54

11  tables that are indicated repeatedly by State Farm, when

12  I execute that -- those damage calculations, I get in

13  some instances the kind of results that you're

14  describing.

15  BY MS. STEIN:                                                02:17:13

16      Q.  Why do you say your hands were tied?

17      A.  Because there was no evidence to suggest that I

18  should use any other than the pricing mortality.

19      Q.  Okay.  But you were the one who decided to use

20  that table in your model, right?                             02:17:28

21      A.  Because it was so obvious that that's the pricing

22  mortality table.

23      Q.  Okay.  Well, that was a decision that you made.

24  But then when the outcome of it showed that sometimes

25  the rates were higher than the loaded rates, you know,       02:17:44

Page 146

1    time correctly.  My best guess is it was three or four

2    months ago.

3        Q.  And how much work did Mr. Ott perform in

4    connection with your work in this case?

5        A.  I don't know his hours, and I don't know how          04:58:15

6    efficient he is in SAS.  And some of the things he did I

7    -- it seemed like they would take a long time.  But

8    that's why, you know, he's the SAS expert.  His

9    turnaround was such that it must not have taken as much

10   time as the complexity, you know, of looking at the code    04:58:40

11   would have you believe.

12        I think it was a pretty straightforward exercise

13   for somebody who's well versed in SAS.  There was an

14   Excel version that was a starting point.  Everything was

15   spelled out.  It was really just a matter of              04:58:55

16   implementing -- implementing -- well, let me back up.

17        It was easier because Dr. Stiroh had provided a

18   SAS model at the time of class certification.  And she

19   turned over her code, which by and large we were able to

20   use as a starting point, and just some minor              04:59:15

21   modifications.  And Mr. Ott recreated a SAS data set,

22   which took some legwork to do.

23        But once the data set was created, then it was

24   just a matter of using the code from Dr. Stiroh.  And

25   then I started looking at the output, identified some     04:59:36

Page 209

1   anomalies.  And then through that process Mr. Ott made

2   some minor modifications to some of coding to help

3   address those anomalies.

4       And that was the extent of the differences in the

5   Dr. Stiroh model versus my ultimate model that I used to   04:59:52

6   calculate the class wide damages.

7       Q.  What do you mean by adjusting code to address the

8   anomalies?

9       A.  There are some inexplicable things that go on in

10  the data.  And I was aware of them in Vogt.  But the       05:00:15

11  size of the data in Vogt, that was about 25% of the data

12  here in Bally.  And perhaps just the additional volume

13  of data is what introduced more anomalies.  But there

14  were two or three policies in particular that when I

15  looked at the damage amounts just didn't make sense.       05:00:38

16      And when I drilled into them deeper, I saw that

17  those policies were filled with anomalous transactions,

18  either backdated premiums or numerous cost of insurance

19  transactions that were assessed and then reversed, and

20  then, you know, assessed and then reversed.                05:01:04

21      You might have hundreds of extraneous data or

22  lines on a given policy.  It ultimately had no bearing

23  on the account value.  Yet when you look at the data

24  without any manipulation or massaging of it, the order

25  of it, the fund balance is jumping all over the place.     05:01:24

Page 210

1    And without some correction, the lost account value,

2    they don't make sense.

3        And so the adjustments that I had Mr. Ott make

4    related to in one instance the ordering of the

5    transactions.  And in the other instance it was          05:01:50

6    identifying situations where because of these strange

7    transactions that ended up being unwound, you would

8    momentarily have an account value that was greater -- or

9    a fund balance that was greater than the death benefit.

10       And because of the ripple effects that that had       05:02:08

11   in the model, when you undid -- or when you, yeah, undid

12   the cost of insurance charge, that didn't undo the

13   ripple effect that you had introduced previously.  And

14   so I needed to find a way to try to negate all of these

15   in a sense transactions in a way that didn't adversely    05:02:27

16   effect the lost account value.

17       And I was able to do that.  It's -- it's -- it's

18   not elegant.  But it is simple in the sense that there

19   were only three or four lines of code that needed to be

20   changed in order to greatly reduce the impact of these    05:02:48

21   anomalies on the damages.

22       And there were a few policies that were cleaned

23   up substantially that instead of a nonsensical account

24   value, lost account value, the lost account value now

25   made sense.                                               05:03:05

Page 211

1       Q.   Which -- which policies were these?

2            Do you list them out in your report or rebuttal

3    report?

4       A.   I don't believe that I do.

5       Q.   Can you describe anywhere in your report or your       05:03:18

6    rebuttal report how you changed the data?

7                 MR. LYTLE:   Object to the form.

8                 THE WITNESS:   Yeah, I don't know if -- I

9    don't think changing the data is the right -- is the

10   right phrase.   And I -- I may have said that.   The SAS      05:03:35

11   data set is the same, to my knowledge, that Dr. Stiroh

12   used and Mr. Ott replicated.

13                The -- the order of transactions has to do

14   with -- I think there was one cell reference where

15   just -- just for example, I think I -- I used effective      05:04:00

16   date versus entry date, or chrono date versus effective

17   date.   But there was -- there was a tweak there in the

18   code that in one particular situation when this oddity

19   occurred I wanted to use a different date.

20                So it's not really a change of the data.         05:04:17

21   It's recognizing that when this odd situation occurs,

22   that I need to pick a different field from the data in

23   order to not introduce an anomaly into my damage

24   calculation.   And I didn't --

25   ///                                                           05:04:34

                                                        Page 212

1    Q.  Yes.  Thank you.

2    A.  I'm there.

3    Q.  Okay.  And do you see in the middle of the

4  paragraph where it says, "I had to ensure that I made

5  necessary adjustments to accommodate SAS coding          05:11:10

6  requirements when transitioning Excel formulas to the

7  SAS application"?

8    A.  I do.

9    Q.  Did -- was that work done by Mr. Ott?

10   A.  Yes, under my direction.                            05:11:26

11   Q.  Okay.  Let's kind of flip back in the rebuttal

12  report to -- okay.  Let's turn to paragraph 8.

13   A.  Okay.

14   Q.  Okay.  In this paragraph you end by saying, "I do

15  disagree that an insurer should, or is permitted to,     05:12:56

16  price products in a way that is inconsistent with or

17  runs counter to the language contained in the insurance

18  policy in order to cover costs and meet profit goals."

19       Do you see that?

20   A.  I do.                                               05:13:12

21   Q.  Is that your expert opinion, Mr. Witt?

22   A.  I -- I don't know how to answer that.  My -- my

23  opinion is that complying with the law is a higher

24  priority than a company meeting its profit goal.

25   Q.  Okay.  But that's not -- you were not engaged to    05:13:32

                                              Page 217

```
 1    not just a company's mortality expectations.

 2         I'm simply pointing out that while I agree with

 3    that, that also in my experience occurs in conjunction

 4    with different policy language than is contained in the

 5    State Farm case here.                              05:24:00

 6       Q.  In some instances?

 7       A.  Well, in every instance that I listed here.

 8       Q.  Right.  Well, I mean you arguably cherry-picked,

 9    right?

10              MR. LYTLE:  Object to the form.            05:24:16

11              THE WITNESS:  I don't -- I don't recall

12    looking at any -- I don't recall looking at any that I

13    turned down.

14    BY MS. STEIN:

15       Q.  Well, counsel gave you some of them to use as    05:24:24

16    examples, right?

17       A.  True.

18       Q.  How many did -- how many insurance policies did

19    you look through to find these examples?

20       A.  I looked at -- I looked at a couple, and I think   05:24:37

21    a couple, two or three came from counsel.  And based on

22    my conversations with them, those were readily

23    identified as well.  It was not an exhaustive search to

24    find examples.  This is -- this type of language is

25    relatively commonplace.                              05:25:06
```

Page 224

```
 1       Q.  So Dr. Stiroh's report identifies differences

 2   between the SAS model that you used in your November

 3   2020 report and the Excel models you used at class

 4   certification.

 5       Those differences have an impact on the          05:40:46

 6   individual lost account value, right?

 7               MR. LYTLE:  Object to the form.

 8               THE WITNESS:  I didn't calculate damages at

 9   class certification on more than just the Bally policy.

10   If you're asking me if the changes that were           05:41:10

11   subsequently put into the model after Dr. Stiroh did her

12   class wide calculation, yes, those changes did have a

13   very modest impact on certain policies damage

14   calculations.

15   BY MS. STEIN:                                          05:41:28

16       Q.  And what is -- what is the reason for the

17   difference?

18       A.  The addressing of the data anomalies that I

19   alluded to earlier with reversal transactions and

20   backdated transactions and -- and those situations where 05:41:42

21   the fund balance ended up being greater than the death

22   benefit due to set anomalies.

23       Q.  In the Vogt case you had a Microsoft Excel

24   damages model, right?

25       A.  I did.                                         05:42:10
```

Page 233

1    used Excel in your prior work in this case and in Vogt?

2                MR. LYTLE:  Object to the form.  Asked and

3    answered.

4                THE WITNESS:  Well, the number one reason is

5    that it would've been incredibly unwieldy to use Excel.    05:46:50

6    It was already incredibly cumbersome in the Vogt trial

7    and in the Vogt case.  And because of the quadrupling

8    roughly of the data in the Bally case, I estimate that

9    there would've been hundreds of Excel spreadsheets, each

10   of which has the power to cripple a laptop by simply        05:47:13

11   opening and saving and changing a cell.

12               And it would take days to -- to do any sort

13   of testing or re-running of the model.  And so SAS is --

14   I mean on a scale of 1 to 10, SAS is a 10 and Excel is a

15   1 in terms of feasibility for this particular -- this      05:47:36

16   volume of data.  And the ease of digging into things and

17   just -- just the overall use.  I mean it's -- it's night

18   and day difference.

19   BY MS. STEIN:

20       Q.  Which parts of the SAS model were built by you     05:47:52

21   and which were built by Dr. Stiroh or Mr. Ott?

22       A.  Sure.  So Mr. Ott built the SAS data set.  That

23   was not made available to us by Dr. Stiroh.  And you can

24   think of the SAS data set as sort of the combination of

25   all the static and dynamic data that was supplied by        05:48:28

                                                    Page 237

```
 1    State Farm just put into a format that it is ready to be

 2    used in SAS.

 3         And that's one of the reasons SAS is so powerful

 4    is that you get the data into the SAS data set, and it's

 5    -- it's amazingly powerful.  You can go from the top of      05:48:46

 6    the data set to the bottom of the data set.  I mean

 7    millions and millions of lines of code.

 8         And in something like Excel it would -- you know,

 9    it would take forever to try to scroll through that to

10    the bottom.  And in SAS you can just -- you can just get     05:48:57

11    there immediately.  So that's -- that's very powerful.

12    Mr. Ott created that -- that SAS data set.

13         Dr. Stiroh gave us -- she turned over her

14    architecture and her code that she used at class

15    certification or around that time.  Mr. Ott attempted to    05:49:23

16    implement that, pointed out that there were some errors,

17    some run time errors just structurally.  He cleaned that

18    up a little bit just so that there wouldn't be an error.

19         And relatively quickly was able to largely

20    reproduce what Dr. Stiroh had presented around the time     05:49:44

21    of class certification.  It was then that -- that data,

22    that -- those outputs that I dug into, observed the

23    anomalies, did some investigation, you know, trial and

24    error to figure out how I could rectify those -- those

25    data issues.                                                05:50:06
```

                                                      Page 238

```
 1          Did that work in Excel, figured out what changes

 2   I wanted to implement.  And then instructed Mr. Ott --

 3   made him aware of what changes I wanted.  And he knew

 4   how within the SAS code to implement those changes.  And

 5   that's it.                                       05:50:24

 6          MS. STEIN:  All right.  Why don't we take a

 7   break.

 8          THE VIDEOGRAPHER:  Okay.  This is the end of

 9   Media Unit 4.  We're going off the record at 5:50 PM.

10          (Recess taken.)                           05:50:42

11          We are going back on the record at 6:00

12   o'clock PM.  And this is the beginning of Media Unit 5.

13          MS. STEIN:  Okay.  I'm just going to ask

14   Katie to please load the two remaining exhibits.

15          MS. YARGER:  Okay.  I've introduced        06:01:02

16   Exhibit 10.

17          (Whereupon, Deposition Exhibit 10 was marked

18   for identification by the Certified Shorthand Reporter,

19   a copy of which is attached hereto.)

20          MS. STEIN:  Okay.                          06:01:09

21          MS. YARGER:  That's been introduced.  And

22   I'll introduce the other one.

23   BY MS. STEIN:

24      Q.  Okay.  So we can load that up.  Let's see.

25   Okay.  Okay.                                     06:01:17
```

Page 239

1    the account value spreadsheet from -- from Vogt and from

2    class certification for Bally.

3         The lost account value, no offset would be the

4    damages model.  And then the output, no offset, is the

5    SAS output.  And so by comparing the information that's          06:05:04

6    in the lost account values, no offset, with the -- with

7    the output, no offset, that's SAS -- I'm sorry, that's

8    Excel versus SAS.

9         And I validated that not only did the total match

10   to the penny, and did the individual policy amounts for         06:05:26

11   each of the 250 policies match to the penny, but the

12   individual line by line, you know, more than 100,000

13   lines of account value calculations matched each other

14   to the penny from the Excel model to the SAS output.

15   And then that same explanation is analogous for the top        06:05:50

16   250.  It was just a different set of 250 policies.

17      Q.  So when you say that you're comparing Excel to

18   SAS for -- for -- all of your modeling was done in SAS

19   for the class wide damages, right?

20      A.  It -- it was, yes.                                        06:06:17

21      Q.  So what -- what comparison were you doing to

22   Excel?

23      A.  This was -- this was my comparison to satisfy

24   myself that Mr. Ott had faithfully -- and Dr. Stiroh,

25   for that matter, had faithfully reproduced what I             06:06:37

Page 242

1    intended to be reproduced in this transition from Excel

2    to SAS.

3         So because of her involvement and his

4    involvement, I wanted to spot check thoroughly a set of

5    policies to see if I could identify any -- any          06:06:57

6    differences.  And I did not.

7        Q.  So you did -- you took a random 250 set and ran

8    the model in Excel, and then compared it to SAS?

9        A.  I did.

10       Q.  Okay.  And how did you choose the random 250     06:07:12

11   policies?

12       A.  I talked with Mr. Ott about random number

13   generators.  And he alerted me to a slick procedure that

14   was in SAS that he could generate random numbers and

15   match them up with the policy data set.                 06:07:30

16        And he did so in a manner that I believe we first

17   identified the 250 policies that had the largest

18   account -- lost account values.  And then made sure that

19   the random 250, you know, there's no overlap.  None of

20   the random policies are in the top 250.  That's my      06:07:55

21   recollection anyway.

22       Q.  Okay.  And then what is -- is that described

23   anywhere in your report?

24       A.  I'm not -- I'm not certain that it is because

25   this was really behind the scenes testing for my own    06:08:21

Page 243